**VIRGINIA:**
                    IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | |
|---|---|
| A.H., a minor by his <br> Parent and Next Friend, P.H., )<br><br>Plaintiff, )<br><br>v. )<br><br>ARLINGTON SCHOOL BOARD, )<br>2110 Washington Boulevard )<br>Arlington, VA 22204, )<br><br>Serve: )<br><br>    Monique O'Grady )<br>    Chair )<br>    Arlington School Board, )<br>    2110 Washington Boulevard )<br>    Arlington, VA 22204 )<br>    Falls Church, VA 22042 )<br><br>Defendant. )<br> | Case No.: _____ |

## COMPLAINT

COMES NOW the Plaintiff, A.H., a minor by his Parent and Next Friend P.H., by and

through undersigned counsel, and petitions this Court for review of the Virginia Department of

Education's Special Education Due Process Hearing Officer Decision dated April 13, 2020, and

states as follows:

**Exhibit A**

## Preliminary Statement

1.     This Complaint is brought before this Court pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (the "IDEA"), Virginia Code § 22.1-213, *et seq.*, and the corresponding federal and state implementing regulations.

2.     Plaintiff seeks review of a decision dated April 13, 2020 by a Special Education Due Process Hearing Officer denying the relief sought in a Request for Due Processing Hearing his complaint for due process submitted December 30, 2019 (the "Due Process Request"). The Due Process Request alleged that the Defendant's failure to provide a free appropriate public education justifies reimbursement for the fees and associated expenses incurred as the result of his unilateral placement at an appropriate private residential school. Specifically, Plaintiff alleged that two proposed Individual Education Plans were not reasonably calculated to enable Plaintiff to receive educational benefits; that the Defendant failed to appropriately consider the recommendations of Plaintiff's private providers supporting residential placement; and that the Defendant failed to timely identify Plaintiff as a student with a disability. Plaintiff alleges that the Hearing Officer erred in her factual findings, erred in her assessment of experts' credibility, erred in determining that Defendant had offered Plaintiff a free appropriate public education ("FAPE"), and erred in erroneously applying the law.

## Parties

3.     A.H. (the "Student") is a seventeen-year-old student who currently attends school at Youth Care Treatment Center ("Youth Care") in Draper, Utah. A.H. previously attended Arlington Public Schools ("APS").

4. P.H. (the "Parent") is the Student's mother and "next friend," as that term is defined in Virginia Code. Parent resides in Arlington, Virginia.

5. The Student is a child with a disability as such term is defined under the IDEA. Pursuant to the IDEA and Virginia law, Student is eligible for special education services under the categories of Autism and Emotional Disability ("ED"). He has been diagnosed with Autism, Major Depressive Disorder Recurrent Episodes Severe, and Anxiety Disorder.

6. Defendant Arlington School Board is the governing body of APS, a public school system located in Arlington, Virginia. Defendant is a Local Educational Agency ("LEA") as that term is defined by state and federal law with regard to the provision of educational services to individuals residing within its boundaries.

## Jurisdiction and Venue

7. This Court has jurisdiction over this matter pursuant to Virginia Code § 22.1-214(D).

8. Venue is proper in this Court pursuant to Virginia Code §§ 8.01-261 and 22.1-214(D) because the parent of the student resides in Arlington County and because the school division is located in Arlington County.

9. Plaintiff timely filed a request for a special education due process proceeding and has exhausted the administrative remedies.

## Statement of Facts

10. Student is a highly intelligent student and is considered twice exceptional because Student is both gifted and a child with a disability.

11. APS originally found Student eligible for special education on March 5, 2009 in the category of Speech/Language Impairment. By late 2011, APS and Parent agreed that Student

3

no longer required speech-language services and terminated special education eligibility in that category.

12.    Parent subsequently notified APS of concerns regarding Student's need for special education due to a diagnosis of Major Depressive Disorder Recurrent Episodes Severe and Anxiety Disorder.  APS considered Student's eligibility for special education in the category of Emotional Disability on or about December 18, 2015.  APS denied eligibility notwithstanding the fact that during the several months preceding the meeting the Student had been admitted to an inpatient facility for ten days, an outpatient program for several weeks, and two residential programs.  Among the residential placements was Grafton School, a residential program for students with disabilities that is licensed by the Commonwealth of Virginia for such purpose. Moreover, APS' own Psychological Evaluation identified numerous school-based incidents that resulted in suicidal ideation attempts at self-harm and identified concerns about Student's "level of anxiety and depression as they interfere with [his] academic performance and peer relationships (and, in the past, with [his] relationships with [his]  teachers)."  APS justified its denial on the basis that Student's impairment has not resulted in an adverse impact on educational performance."

13.    Between October 2017 and February 2018, Student received an education at North Spring Behavioral Health, a residential program, because of his inability to access an education within APS due to disability. APS did not undertake to evaluate or identify Student as eligible for special education services during his ten months at North Spring.

4

14.    In late 2017 or early 2018, Caroline Ba, Psy.D., M.P.P., evaluated Student. Dr. Ba's January 2018 Neuropsychological Evaluation diagnosed Student with Major Depressive Disorder Recurrent Episodes Severe, Anxiety Disorder, and Autism Spectrum Disorder.

15.    On April 2, 2018, APS found the Student eligible for special education services pursuant to the IDEA in the category of Emotional Disability. APS did not evaluate the Student's eligibility in the category of Autism at that time.

16.    APS then developed Student's initial IEP, dated April 23, 2018, and proposed a private day placement at The Kellar School ("Kellar"). Kellar is a private therapeutic day school located in Fairfax, Virginia, that provides education to students with disabilities and is licensed by the Commonwealth of Virginia for such purpose. Parent consented to the proposed placement, and Student began attending Kellar shortly thereafter.

17.    The Student's IEP was amended on August 1, 2018 to allow the Student to take "one course of study through the Arlington Career Center in the public day school setting." Parent consented to the IEP, and the Student began attending one class at Arlington Career Center ("APS Career Center") on or about the beginning of the 2018-19 school year. Student remained at Kellar for the remainder of his daily education. It was well known that Student did not like attending Kellar and strongly desired to return full-time to an APS school.

18.    On January 24, 2019, the IEP Team changed Student's placement to Public Day School. Parent consented to the change in placement, and Student was placed at APS Career Center.

19.     Student had difficulty accessing his education at APS Career Center due to his disability and was hospitalized on multiple occasions in March, April, and May 2019 due to suicidal ideations and suicide attempts.

20.     Student's special education services and public day placement remained unchanged in IEPs proposed by APS after IEP meetings held on March 25, 2019 IEP and May 23, 2019.

21.     Prior to and during the May 23, 2019 IEP meeting, Parent provided written and verbal notice to APS that she was considering enrolling Student in a residential program in Utah. The IEP dated May 23, 2019 (the "May 2019 IEP") did not provide Student with ESY services for the summer and stated that "student does not need critical Life skills training at this time." The May 2019 IEP proposed placement in a public school setting at APS' Interlude program for the 2019-20 school year.

22.     The Student began attending Youth Care on June 5, 2019. Student has remained enrolled at Youth Care through the present.

23.     Youth Care, and its educational component Pine Ridge Academy, is accredited to operate as a residential treatment program and day treatment program by the State of Utah, and the school was fully accredited as a high school by AdvancedED.

24.     Parent made payments to Youth Care for Student's services through January 31, 2020 in the amount of $56,740. Parent incurred expenses in connection with Student's attendance at Youth Care through January 31, 2020 in the amount of $3,616.58. Parent continues to make monthly payments to Youth Care for Student's education and incur associated expenses.

25.     Megan McCormick, Ph.D., a private provider located in Utah, evaluated Student in August 2019. Dr. McCormick's Psychological Evaluation stated that "In order to access [an] education, benefit from instruction and receive a Free Appropriate Public Education (FAPE) it will be critical for [Student] to remain in a long-term, therapeutic, residential treatment program."

26.     APS convened the IEP team on August 28, 2019 and September 10, 2019 to discuss Student's special education. Student's lead therapist at Youth Care and Pine Ridge Academy's Academic Director participated in these IEP meetings.

27.     On September 14, 2019, APS issued a proposed IEP (the " September 2019 IEP") that offered private day placement for Student, not residential placement.  Moreover, the September 2019 IEP did not appropriately address Student's needs in the present levels of performance section and did not identify appropriate goals for each of Student's areas of need.

28.     Parent notified APS, in writing, on October 2, 2019 that she would not consent to the September 2019 IEP. On October 3, 2019, Parent provided APS with written reasons why the September 2019 IEP did not provide FAPE, including that Student required private residential placement as the LRE.

29.     On November 4-5, 2019, APS School Psychologist Jessica Kingsley evaluated Student at Youth Care, with Parent's consent. Ms. Kingsley met with Student, as well as Youth Care teachers and therapeutic staff.  Ms. Kingsley is the only APS employee with personal knowledge of Student's needs subsequent to May 23, 2019.

30.     Ms. Kingsley's report stated that [Student] appears to have made progress in the "very structured setting of Youth Care." In her summary, Ms. Kingsley commented on Student's

"fragility" and that the Youth Care therapist "agreed with this sense of fragility, reporting that [Student] continues to need a great deal of support in coping mechanisms and social skills..."

31.     Parent again provided written notice to APS regarding the need for private residential placement on November 21, 2019.

32.     On December 3, 2019, APS found the Student eligible for special education in the categories of both Emotional Disability and Autism. The eligibility team identified the Student's primary eligibility category as Autism.  This was the first time APS had considered Student's eligibility in the category of Autism, despite knowledge of the diagnosis since early 2018.

33.     APS convened an IEP meeting on December 10, 2019 (the "December 2019 IEP meeting") to discuss Student's placement. Ms. Kingsley, the only APS employee with personal knowledge of Student's needs after May 2019, did not participate in the December 10, 2019 IEP meeting.

34.     Following the December 10, 2019 meeting, APS provided the Parent with a proposed IEP (the "December 2019 IEP"). The December 2019 IEP proposed Private Day Placement as the least restrictive environment. During the December 2019 meeting, APS verbally proposed private day placement at Youth Care.  The December 2019 IEP proposed placement in "N/A not a countywide program," without identifying a specific school or program, either within or beyond APS.

35.     APS memorialized in the accompanying Prior Written Notice that the "APS team proposed that the Private Day Placement site could be provided through Youth_Care as the provider of the educational services and would be responsible for the implementation of the APS IEP."

36.    The December 2019 IEP did not identify frequency or duration of services that would be provided to Student in the private day placement. APS maintained the position that it would only identify frequency or duration of services that would be provided to Student pursuant to the December 2019 IEP if the parent first agreed to accept APS' proposed private day placement.

37.    The December 2019 IEP did not identify appropriate goals for each of Student's areas of need; did not address transportation to and from the private day placement; and did not identify which LRE options were considered.

Exhaustion of Administrative Remedies

38.    The Parent filed a Request for Due Process Hearing Under the Individuals With Disabilities Education Act with APS and the Virginia Department of Education on December 30, 2019.

39.    The Due Process Request alleges that the September 2019 IEP and the December 2019 IEP did not identify an appropriate placement for Student, did not provide appropriate services, did not include appropriate present levels of performance, and did not provide FAPE. Moreover, the complaint alleged that APS violated applicable law due to its improper predetermination of the placement decision regarding the September 2019 IEP and the December 2019 IEP meetings and its failure to timely identify Student as eligible for special education services.

40.    As remedies, Parent requested that APS be directed to implement an IEP designed to meet Student's individualized needs, including his appropriate placement at Youth Care; that APS be directed to reimburse Parent for any and all tuition, fees, costs, and expenses incurred with

9

regard to Student's enrollment and attendance at Youth Care, including transportation and the provision of related and supplemental services, beginning June 5, 2019 through the date when APS implements an IEP providing for private residential placement at Youth Care; that APS be directed to pay for Student's future tuition, fees, costs, and expenses to attend a private residential school, including transportation and the provision of related and supplemental services; that APS provide reimbursement to Parent for any tutoring expenses and counseling/therapy fees she has incurred relating to Student; that APS be directed to provide compensatory education to Student, including, for the period when APS failed to provide Student with FAPE; and any other relief the Hearing Officer deems appropriate. The Parent also asserted her right to request an award of her attorney's fees and costs incurred in the event she is a prevailing party in the due process proceeding.

41.     Morgan Brooke-Devlin was appointed on January 6, 2020 to serve as the Hearing Officer regarding the Due Process Request.

42.     A due process hearing was held on February 18, 19, 20, 21 and 24, 2020 before Hearing Officer Brooke-Devlin.

43.     Parent witnesses Megan McCormick, Emily Thomas, and Josh Vineyard were qualified by the Hearing Officer as expert witnesses.   These expert witnesses had personal knowledge of Student's educational needs, including the LRE, while he has resided at Youth Care. All three testified that Student required private residential placement as the LRE in order to receive FAPE as of the September 2019 IEP and the December 2019 IEP.

44.     During the hearing, Ms. Thomas, Student's therapist at Youth Care, was asked if, as of September 2019 "Would it have been appropriate placement for [Student] to be in a private day school setting in Virginia?" She testified "No, for the same reasons. I believe that [Student] would

10

have very quickly decompensated and very likely would have been able to find a way to either self-harm or commit suicide outside the 24/7 care."

45.     During the hearing, Mr. Vineyard, the Academic Director of Pine Ridge Academy, the educational component of Youth Care, testified that Student's placement at Youth Care was appropriate: "Considering the level of care that [Student] is still requiring, it is still my recommendation that an IPC be the level of placement."

46.     During the hearing, Dr. McCormick, the school psychologist retained by Youth Care to perform a psychological evaluation of Student in August 2019, testified that [Student] required placement in a residential school.

47.     APS staff who testified at the due process hearing included Jessica Baker (Assistant Principal at the APS Career Center), Naghmeh Merck, LCSW (School Social Worker), Ashley Neal (a general education teacher), Scott Lockhart (a general education teacher), Jessica Kingsley (school psychologist), and Heather Rothenbuescher (Interim Director of Secondary Special Education). Other than Ms. Kingsley, none of the APS staff who testified at the due process hearing had seen or spoken with Student since May 2019, if not earlier. Ms. Kingsley had no knowledge about Student prior to being asked in October 2019 to travel to Utah to conduct a psychological evaluation.

48.     APS witness testimony regarding Student's special education needs was based upon their knowledge of Student prior to May 2019.

49.     APS witness testimony regarding the appropriateness of private day placement in the September 2019 IEP was based upon their recollection of Student's performance while attending Kellar between April 2018 and January 2019.

11

50.    APS did not provide any expert witness testimony at the due process proceeding regarding Student's educational needs as of the September 2019 IEP meeting or the December 2019 IEP meeting.

51.    APS did not provide any expert witness testimony at the due process proceeding regarding the appropriateness of APS' proposed LRE identified in the September 2019 IEP or the December 2019 IEP.

52.    The parties submitted post-hearing/closing briefs on March 10, 2020 and March 16, 2020.

53.    The Hearing Officer issued her written Findings of Fact and Decision dated April 13, 2020, and transmitted it by email to counsel for the parties on April 14, 2020 at 12:01 a.m. The Hearing Officer subsequently issued a replacement decision (the "Hearing Officer's Decision"), which she transmitted by email to counsel on April 14, 2020 at 1:19 a.m. Exhibit A.   The replacement document deleted twenty-three extraneous pages from the initial transmission.

54.    The Hearing Officer's Decision states that "[i]n determining the relative weight to be given to the testimony of the witnesses I find that the testimony of the Arlington Public School's experts which included [Student's] therapists, school counselors, school psychologist, and other professionals who were actively involved with SH during 2018-19 and who took part in the drafting of his 2018-19 IEPs to be the most persuasive. Many of the witnesses had known and worked with [Student] for years. Witnesses who testified about the IEP meetings and had the opportunity to observed [sic] him and listen to his concerns. They reviewed his academic records, report cards and progress notes as well as the medical information provided by [Parent] to reach their IEP recommendations. I also find that deference should be given to the opinions of the APS witnesses."

55.     The Hearing Officer also stated "I do not give a great deal of weight to the Parent's expert's opinions that [Student] needs to be in a residential placement center because I do not believe that their opinions were fully informed. The parent's experts who testified telephonically, Ms. Emily Thomas, Mr. Josh Vineyard, and Dr. Megan McCormick, while accepted as experts in their fields, had no knowledge of [Student's] years at APS, did not know that [Student] had successfully attended Kellar private day school; did not know any information regarding the private day schools proposed in the September and December IEP meetings; Additionally Youth Care had never requested [Student's] educational records from APS, nor did anyone from Youth Care contact [Student's] teachers at Kellar or the APS Career Center to discuss [Student's] educational progress. It was also clear that Youth Care never reviewed [Student's] prior IEPs, or had knowledge of the basis for the APS recommendations...I did not find [Ms. Thomas and Dr. McCormick's] opinions that [Student] needed to have a residential placement to be persuasive. I gave more weight to APS testimony regarding how well [Student] did at the Kellar School and his part time at the APS career center."

56.     The Hearing Officer's Decision improperly stated as a finding of fact that the December 2019 IEP "could not be finalized" because Parent did not provide "permissions...; itemization of services by Youth Care; a contract with Youth Care including an agreed upon rate for day placement." This finding was error and not entitled to deference because it was not supported by the evidence or the law.

57.     The Hearing Officer's Decision ruled in favor of APS and denied all relief requested by the Parent.

Count One:  Administrative Appeal Pursuant to IDEA and Virginia Code § 22.1-213, *et seq.*

58.     Plaintiff repeats and realleges Paragraphs One through Fifty-Seven of the Complaint as if they were set forth in full herein.

59.     The Hearing Officer's Decision is contrary to the evidence.

60.     The Hearing Officer's Decision is contrary to the requirements of the IDEA and other applicable law.

61.     The Hearing Officer's Decision that APS did not deny student FAPE in its September 2019 and December 2019 IEPs was contrary to the law and the greater weight of the evidence introduced at the due process hearing.

62.     The Hearing Officer's Decision improperly discounted the weight of testimony provided by Parent's witnesses, including expert witnesses Dr. McCormick, Ms. Thomas, and Mr. Vineyard. These experts had actual knowledge of Student's present levels of performance and educational needs since he enrolled in Youth Care in June 2019. They did not testify as to his educational needs prior to enrollment at Youth Care and consequently, their credibility should not have been discounted merely they did not testify about Student's education more than year before the due process hearing.

63.     The Hearing Officer's Decision improperly gave greater weight to the testimony of APS employees "who were actively involved with [Student] during 2018-2019 and who took part in the drafting of his 2018-2019 IEPs . . ." Those witnesses had not observed or interacted with Student for more than ten months" and did not have actual knowledge of Student's needs in either September 2019 or December 2019.  It was reversible error for the Hearing Officer to give greater weight to the APS employees' testimony than to Parent's experts (and Parent).

64.    The Hearing Officer's Decision was contrary to the testimony of Plaintiff's experts who each testified that Student required private residential placement as the LRE in order to receive FAPE at the time the September and December 2019 IEPs were drafted.

65.    The Hearing Officer's Decision improperly disregarded the evidence demonstrating that Student's unique educational needs between May 2019 and the present differed from Student's educational needs while attending Kellar and the APS Career Center.

66.    The Hearing Officer's Decision erred because the December 2019 IEP did not offer FAPE.

67.    The Hearing Officer's Decision committed factual and legal error in finding that the December 2019 IEP was not "finalized."   Exhibit A at Finding of Fact No. 55.

68.    The Hearing Officer committed legal error because she precluded Parent from introducing evidence on the basis that it was dated more than two years prior to when she filed the Due Process Complaint.

69.    The Hearing Officer committed legal error by improperly applying the statute of limitations.   The Hearing Officer improperly restricted claims to the period that "begins on December 31, 2017 and ended on December 31, 2019.  The Hearing Officer's Decision disregarded Parent's right to:

> Present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows, except that the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph.

20 U.S.C. § 1415(b)(3)(6).

70.     The Hearing Officer committed legal error because she precluded Parent from introducing evidence of alleged violations of the Child Find obligation and APS's failure find Student eligible prior to December 31, 2017.

71.     The Hearing Officer's Decision was otherwise contrary to the law and the evidence.

<u>Count Two:  Denial of FAPE in Violation of the IDEA</u>

72.     Plaintiff repeats and realleges Paragraphs One through Seventy-One of the Complaint as if they were set forth in full herein.

73.     Defendant violated federal law by denying and/or not offering FAPE to Student. Parent thereafter secured an appropriate education for her child by enrolling him at Youth Care.

74.     Youth Care is an appropriate placement for Student.

75.     Parent provided notice to Defendant of Student's placement at Youth Care that was sufficient to support reimbursement.

76.     On December 30, 2019, Parent requested a special education due process hearing in order to recover reimbursement for the costs of her child's placement at Youth Care.

77.     This action challenges the Hearing Officer's Decision pursuant to the IDEA and Virginia law.

78.     Parent has exhausted her administrative remedies.

79.     As a result of the Defendant's failure to make a free appropriate public education available to the child in a timely manner, Plaintiff is entitled to reimbursement for the costs and expenses incurred as the result of Student's placement at Youth Care.

80.     As a result of the Defendant's failure to provide FAPE, Plaintiff has also incurred attorney's fees and expenses for which she seeks recovery in an amount to be determined by the Court and in excess of $50,000.00.

81.     Parent has exhausted her administrative remedies.

82.     As a result of the Defendant's failure to make a free appropriate public education available to the child in a timely manner, Plaintiff is entitled to reimbursement for the costs incurred as the result of Student's placement at Youth Care.

83.     As a result of the Defendant's failure to provide FAPE, Plaintiff has also incurred attorney's fees and expenses for which she seeks recovery in an amount to be determined.

WHEREFORE, A.H., a minor by his Parent and Next Friend, P.H., asks that the Court:

1.     Conduct a review of this case pursuant to the IDEA and Virginia Code §22.1-214;

2.     Enter judgment for Plaintiff and against Defendant;

3.     Order that the decision of the Administrative Hearing Officer should be reversed;

4.     Grant declaratory relief ordering Arlington School Board to implement an IEP to meet Student's individualized needs, including his appropriate placement at Youth Care;

5.     Award Plaintiff reimbursement for the costs incurred in connection with Student's placement at Youth Care, including transportation and the provision of related and supplemental services, beginning June 5, 2019 through the date when APS implements an IEP providing for private residential placement at Youth Care;

6.     Order that Plaintiff, as prevailing party, shall be awarded court costs, witness fees, expenditures and reasonable attorney's fees, pursuant to 20 U. S. C. 1415.

7.     Award Plaintiff the reasonable attorney's fees and costs incurred in accordance with the IDEA and Virginia law; and

8.     Grant Plaintiff all other relief this Court deems fair and equitable.

A.H., a minor, by his Parent and Next Friend, P.H.

By

Counsel

Harold G. Belkowitz
Virginia State Bar No. 37274
hbelkowitz@belkowitzlaw.com
Belkowitz Law, PLLC
10427 North Street, Suite 200
Fairfax, Virginia  22030
(703) 246-9273
(703) 246-9271 facsimile

18



## VIRGINIA DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION AND STUDENT SERVICES OFFICE OF DISPUTE RESOLUTION AND ADMINISTRATIVE SERVICES

| | |
|---|---|
| **Arlington County Public Schools** **School Division (APS)** | ████████ **Parent** |
| **Mr. John F. Cafferky, Esq.** **Ms. Aneta Nikolic, Esq.** **Counsel Representing APS** | **S.H.** **Child** |
| **Mr. Harold G. Belkowitz, Esq.** **Counsel Representing Parent** | |
| **Mr. Reginald Frazier, Esq. Evaluator** | |
| **Morgan Brooke-Devlin, Esq.** **Hearing Officer** | **Parent initiated Hearing** |

## HEARING OFFICER DECISION

### Procedural Background:

This action stems from the filing of a Due Process Complaint with the Virginia Department of Special Education and Student Services Office of Dispute Resolution by ████████████ against Arlington County Public Schools (APS) alleging that defendant failed to provide S.H. (SH) a free appropriate public education ("FAPE") in contravention of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"). The Parent asserts that APS has failed to provide an Individualized Education Program (IEP) that contained appropriate goals, accommodations, services and placement to enable SH to access a meaningful educational benefit during the 2018-2019 school years ,given SH's unique educational needs.

1

The Due Process Complaint was filed on December 31, 2019. The Due Process Hearing was conducted by this Hearing Officer on February 18, 19, 20, 21 and 24, 2020. The parties introduced a total of One Hundred and Seventy Three exhibits and 13 witnesses.

This Decision is within the time limitation period under the IDEA. The record includes the electronic recording of the February 18-21 and 24, 2019 IE Hearing, Parent's Due Process Request, Arlington County Public Schools Response to the Due Process Request, Orders, the Parent's exhibit book, the APS exhibit book, Parent's and APS closing and response briefs including Proposed Findings of Fact and Conclusions of Law as well as the full written transcript of the Hearing.

**Burden of Proof:**

In *Schaffer v. Weast,* 546 U.S. 49, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005), the United States Supreme Court held that the burden of proof, in an administrative hearing challenging the IEP, is properly placed upon the party seeking relief, whether that is the disabled child or the school district. *Id.,* at 537. The Parent filed this due process hearing request. Accordingly, I find that the Parent has the burden of proof at this Due Process Hearing.

A.   **Threshold Issue: Statute of Limitations:**

In her Due Process Complaint the Parent referenced, among other things, alleged violations by APS concerning SH's special educational eligibility in 2011, 2015 and 2017. Therefore, the threshold issue in this case is whether the Parent has met her burden of proof in establishing that there exists in her favor an exception to the two year statute of limitations regarding alleged violations regarding Child Find

2

and APS's failure to find SH to be a student with disabilities in need of an IEP in 2011, 2015 and 2017.

The IDEA as well as the Commonwealth of Virginia have a two-year statute of limitations period within which parents can raise concerns and note objections regarding their child's educational process and/or bring complaints regarding the actions taken or not taken by the School system in the delivery of a free and appropriate education to the child (FAPE). 20 U.S.C. Section 1415 (b)(6)(B). The two year period runs from the date the party knew or should have known about the alleged violations of the law or regulations.(20.U.S. C. Section 1415(f)(3)(C)). According to 34 CFR 300.511(f) the only exceptions are when the parent is prevented from requesting a due process hearing due to (a) specific misrepresentations by the District that it had resolved the problems forming the basis of the complaint, or (b) the district's withholding of information from the parent that the IDEA required it to provide and if because of that the parent was prevented from filing a complaint.

The Parent's Complaint was filed on December 31, 2019. Accordingly, the two-year statute of limitations period begins on December 31, 2017 and ended on December 31, 2019. Therefore, any claims made regarding the period prior to December 31, 2017 are found to be time-barred. The Court in *Emery v. Roanoke City Sch. Bd.*, 423 F. 3d 294,300 n.2 (4th Cir. 2005 ) found that the two-year statute of limitations bars parent's request for a due process hearing and in *Fairfax Cnty. Sch. Bd. v. Knight*, 107 LPR, 2101 (E.D. Va. 2006) the parent's recovery was limited to the alleged violations by the school district which had occurred within the two years prior to the filing of their Due Process Request.

The Attorney for APS objected to the Parent introducing testimony and evidence at the hearing that pre-dated December 31, 2017. The objection was sustained. Subsequently, APS included discussion in its closing brief of events that occurred prior to the 2017 time period primarily in a narrative of SH's history as a student in APS.

In his response brief the Attorney for the Parent took issue with the inclusion of this information and argument claiming that it was inappropriate for APS to raise and discuss these issues where there had been no testimony regarding these issues at the hearing as a result of APS's objection. The Parent's objection is well founded; however, there is a distinction to be drawn between providing a narrative of the child's educational timeline which pre-dates the two year period and being permitted to introduce evidence and testimony at the Due Process Hearing to support allegations of denial of FAPE which occurred prior to the two year statute of limitation period.

Other than evidence needed to determine whether FAPE was provided to SH within the two year time period leading up to December 31, 2019, allegations made in the Parent's Due Process Complaint and in the parties' closing arguments regarding the pre December 31, 2019 time period will be disregarded, [1]

Based on my review of the evidence and testimony I find that neither of the exception to the two year statute of limitations as set out in 34 CFR 300.511(f) have been established by the Parent in this matter. Consequently, I limit the time frame in this Decision to the allegations of denial of FAPE and other matters raised for the period between December 31, 2117 and December 31, 2019.

---

[1] The Parties Moved to have all exhibits in their exhibit binders entered into evidence. The Motion was granted and all exhibits were admitted. It should be noted that these exhibits included documents that pre-dated the December 31, 2017 two year statute of limitation date.

4

**Factual Findings:**

1.      SH is a sixteen year old child who, until being placed by his Mother in a

Utah residential facility known as Youth Care in June of 2019, lived with her in

Arlington, Virginia.[2]

2.      During January and until the first of February 2018, SH continued to

attend North Spring Behavioral Healthcare's residential program in Leesburg,

Virginia. SH's placement in North Springs was for mental health medical

purposes. SH's admission to the North Spring facility was made unilaterally by

the Parent. APS had no involvement in placing SH in North Spring.

3.      SH was discharged from North Spring on February 1, 2018, during

what would have been his 9th grade school year. (P. Ex. 29).

4.      The North Spring Academy Education Discharge Summary dated

February 2, 2018 noted that:

"Upon admission, AH presenting behaviors included anxiety, depression,

fearfulness, helplessness, isolation, manipulation, oppositional behavior, poor

self-esteem and poor social skills." *Id.*

5.      The Parent did not claim that placement in North Spring was an

educational placement. Nor did she request that APS fund the placement.

6.      On February 2, 2018 APS issued a Prior Written Notice which notified

SH's Parents that the Student Study Committee had reviewed existing date including: a

---

[2] SH was born AH: a female. In March of 2019 AH advised her Mother and others that she was a
transgender male and asked to be called SH and to be referred to as a male. As such, the student will be
referred to as SH and male throughout this Decision.

teacher narrative, SOL's, North Spring Behavioral Healthcare documents (case management discharge summary), BRIEF 2 teacher Form, medical history & physician exam, safety crisis plan, and concerns of committee members and student. After reviewing the existing information the committee decided to collect additional data for evaluation. (P. Ex. 30).

7.    On February 9, 2018 a Referral and Student meeting was held which was attended by ▆▆▆▆▆ and SH. The reason for the referral was to address SH's mental health needs and to develop a plan to assure his safety and transition back to school. (P. Ex. 32) At the time of this meeting SH was participating in the partial hospitalization program at Dominion Hospital, a step down treatment from the residential setting at North Spring. (P. Ex. 35)

8.    While the evaluation was being conducted SH was approved for Homebound services. A Memorandum was sent to the Parents on February 23, 2018 by Heather Rothenbuescher, APS Special Education Supervisor, advising them that SH had been approved for Homebound services through March 30, 2018, and "that at the end of that period, an extension may be requested by submitting an updated medical certification of need." (P. Ex. 31)

9.    The Parents hired Dr. Caroline Ba., a Pediatric Neuropsychologist, to conduct a Neuropsychological Evaluation of SH. The Doctor's report is undated but notes that services were rendered on 1/2/2018, 1/23/2018 and 1/29/2018. In a March 9, 2018 e-mail sent by SH's Father, ▆▆▆▆▆, to Yvette Bullock, the APS Special

6

Education Coordinator, the Father referenced and attached Dr. Ba's Report. I find that the Report was provided to APS around the beginning of March, 2018. (P. Ex. 27 & 33)

10.   In her Report, Dr. Ba noted that there had not been any prior evaluations before hers and that SH had participated in intermittent private counseling services since age 6. (Apparently, Dr. Ba was not told that APS had done psychological evaluations of SH in 2015) She noted that SH met the DSM-5 criteria for Major Depressive Disorder, recurrent severe and Generalized Anxiety Disorder. She also found that SH met the DSM-5 criteria for high functioning Autism Spectrum Disorder.

Dr. Ba noted that A is a 'brilliant girl who performed within the Extremely High range on the Wechsler Intelligence Scale for Children, Fifth Edition (WISC-V GAI-134)", and that "There are no academic concerns despite limited attendance. She is a bright conscientious student who excels in all subjects and is motivated to do well." *Id.*

In her Recommendations for academic placement Dr. Ba made a number of specific suggestions including her belief that SH qualified for an IEP based on her diagnosis. She did not, however, recommend that SH needed to be enrolled in a residential placement. *Id.*

11.   To assist the eligibility committee in its determinations, APS School Psychologist, Greg Myers, NCSP, prepared a Review of Prior Psychological Evaluations. In his review he noted that comprehensive evaluations, including a psychological evaluation, were performed in 2015 to determine SH's eligibility for special education. In his report, dated March 26, 2018, Mr. Myers also summarized Dr. Ba's March 2018

Report and incorporated some of her recommendations into his recommendations to the
Eligibility Committee for their consideration. (EX. P. 34)

12.     A Special Education Committee met on April 2, 2018 to determine SH's
eligibility for Special Education services. ▮▮▮▮▮▮ and SH attended and formed part of
the Evaluation Committee Team. The Special Education Committee Report included
sections titled "Parent Information, Eligibility and Essential findings. Included in these
sections was a detailed discussion of Dr. Caroline Ba's neuropsychological evaluation of
SH, including specific mention of the new additional diagnosis of Autism Spectrum
Disorder. The Committee incorporated some of Dr. Ba's findings and recommendations
in its Report. (Ex. S-7-0001-0007)

The Report stated that:

"After an extended review and discussion of all evaluative information and
considering input and concerns from committee members of the team determined that A
requires special education services as a student with an Emotional Disability, while
recognizing that some of her behaviors may be associated with her new private diagnosis
of Autism. The school team felt strongly that it is A's significant difficulties with
emotional functioning that currently impedes her ability to attend school. Complete new
IEP within 30 calendar days." *Id.*

13.     Review of the Eligibility Report demonstrates that the Parent's claim that
APS disregarded Dr. Ba's Report and her Autism diagnosis for SH is without merit. It is
clear that the Committee considered all relevant documentation and evaluations before it
determined that SH's emotional disability was the primary factor in their eligibility

8

determination for special education services. The teams conclusion that SH's was eligible

for services upon a finding of Emotional Disability was supported by the available

documents and evaluations. The team considered Dr. Ba's evaluation which found that

SH met the criteria for high functioning autism but determined that SH required special

education services as a student with Emotional Disability. I find that the IEP eligibility

team decision was appropriate and incorporated all necessary criteria for a determination

of eligibility for SH.

14.     An eligibility Letter was sent by APS to the Parents on April 2, 2018

notifying them that "Based on a review of all available information, it was determined

that your child is: Eligible for special education services under the classification of:

Emotional Disability." Enclosed with the letter was a copy of the eligibility meeting

minutes and a copy of "Your Family's Special Education Rights-Virginia Procedural

Safeguards Notice. The Letter also advises the Parents that if they had any questions

regarding the Committee decision they could contact the author of the Letter, Ms. Yvette

Bullock, APS Special Education Coordinator. (Ex. S-7-001-910). Ms. Bullock was never

contacted by Mr. or Ms. ████ with concerns that the autism diagnosis had not been

specifically designated as a disability.

15.     On April 23, 2018 an IEP meeting was held. Both Mr. and Ms. ████ as

well as SH attended and took part in the meeting. This was SH's initial IEP. (Ex. P. 37)

████ signed her agreement to the IEP.

The Committee considered the student's "Strengths and Needs." Enumerated in

this section are references to "a private neuropsychological evaluation." Since the only

9

private neuropsychological evaluation that was performed was the one done by Dr. Ba

this establishes that the Committee did review and consider Dr. Ba's Evaluation and

Report in its deliberations.   Dr. Ba's diagnosis of Autism is found in the section of her

Report dealing with Social Functioning. The IEP, while not specifically identifying

Autism, does reference Dr. Ba's diagnosis that SH has difficulties with social emotional

functioning. The IEP notes that "Social/Emotional functioning has shown to interfere

with her learning."; and she is "easily overloaded in social situations."

The IEP established appropriate goals, accommodations, services and related

services as well as addressing Transition and Extended School Year (ESY).

In the IEP section identified "Parent's Input for Enhancing Child's Education", it

is noted that the "Parent desires for Abigail to be in a stable school environment to best

meet her educational and emotional challenges." A Safety plan was also recommended.

The Team considered both public day school and private day schools and

selected the private Kellar School as the least restrictive placement for SH. In conjunction

with choosing Kellar the Team also found that SH should receive transportation as well

ESY Services. *Id.*

The April 23, 2018, Prior Written Notice relates in the Description of the factors

relevant to the actions proposed or refused that: "A and her Parents visited some

proposed private day schools" and that "The Kellar School accepted SH and the IEP

team, parents and student agreed to the placement.  SH will begin with a social emotional

goal and counseling as related service. Accommodations will be attempted." (P. Ex. 38)

16.     I find that the April 23, 2018 IEP provided SH with a free and appropriate

public education (FAPE), because APS provided SH with an educational program

reasonably calculated to provide him meaningful educational benefit specially designed

for his unique educational needs and to make progress appropriate in light of his

circumstances. Further evidence of the appropriateness of the IEP was the high level of

success that SH achieved at the Kellar School.

17.     The Kellar School, located in Fairfax Virginia, is an accredited,

therapeutic private day school for students with emotional disabilities, high-functioning

autism and other related disabilities, who can benefit from a regular high school

curriculum. (Tr. 2/18/20- 271-273).

SH began attending the Kellar School in April of 2018 and continued to attend the

school until January of 2019. The Kellar School has a few dozen students and very small

classes. SH's classes usually had 5-6 students. (Tr. 2/18/20-180) (Tr. 2/21/20-179, 273).

All teachers are certified in special education and experienced with working with students

with emotional disabilities. (Tr. (2/21/20- 271-273).

Emotional support for student's education is built into the program.. The school

uses a level system for the students in which they progress through four levels of

responsibility and independence. (Tr. 2/18/20-194)

Kathryn Russell, the Parent's expert testified that the assistance provided to

students depends on the needs of the student, regardless of their particular disability

classifications or labels they have or don't have. (Tr. 2/18/20-205)

18.    SH did very well at Kellar. His grades were mainly in the mid to high 90th percentile and he passed his Virginia Standards of Learning exams (SOLs) in Biology, Geometry, and World History, (Ex. S-12-001 to 002). Importantly, he also appropriately accessed the counseling and other therapeutic supports offered. (Tr. 2/20/20-237; Ex. S 16-003) (Ex. S-2-001)

During the 2018 ESY summer period SH successfully completed two classes on line: Spanish and Health P/E.-earning an A in both. (Ex. S-12-004). *Id.*

SH continued to make good progress at Kellar as reflected in his Extended School Year Progress Report that noted that he "was able to successfully complete 100% of focal goal points based on recognizing her emotions, rating them and using coping skills when needed." (Ex. S. S-14-001). His attendance was also quite good. During the ESY summer period he attended 16 out of 22 days with six excused absences.

SH's Kellar Quarterly  Report School for school year 2018-2019 demonstrated progress in educational as well as in social and emotional issues, and an excellent attendance record of fourth one out of forty four days from August 28 through November 2, 2018. (Ex. S-15-001-003)

SH made excellent educational progress. He earned a 98% in Chemistry, a 90% in History, an 84% in Algebra II, 96% in independent living skills and 97% in English. Progress was noted in his goals as evidenced by his asking for help and advocating for himself in 4 out of 5 observations. It was also observed that there were no disciplinary concerns with SH. *Id.*

12

SH continued to attend Kellar School through January 24, 2019, for a total of approximately nine months. His Second Quarter grades reflected that he had brought up his 84% in Algebra II to 96% and that the remainder of his grades remained in the 90% level. (Ex. S. 16-001). During the November through December 2018 period his grades were very good. He got 94 in Chemistry, 85 in World History & Geography from 1500, 95 in Algebra, 90 in Independent Living Skills and 93 in English 10. He attended seventeen out of twenty days with three excused absences. (Ex. S-19-001)

19.    Of special note is that during SH's nine months at the Kellar School he had no suicidal episodes, no hospitalizations and no emotional breakdowns, He also had very good attendance and appeared to thrive at Keller. I give little weight to ███████ testimony that SH was only "faking it" at Kellar in order to get to Arlington Tech. (Tr. 2/18/19-p. 52) Whatever the motivation SH demonstrated that he was able to access his education, make very good progress educationally and remain psychologically stable while a student there.

20.    In the summer of 2018, SH had expressed a desire to take a class in Animal Science at the Academic Academy at the Arlington Career Center. An IEP Amendment meeting was held on August 1, 2018 to determine if that would be appropriate. ███████ was present and SH was noted as having been consulted. The Amended IEP provided that SH would continue to attend Kellar and take one course of study through the Arlington Career Center in the public day school setting. (Ex. S-13-016). Of note are ███████ comments in the Parental Input section of the Amended IEP:

13

"Parent shared that she would like Abby to consider a year at NOVA. Parent also

shared that she would like Abby to continue to progress at Kellar and to remain at Kellar.

The greatest concern for both Abby and her parents is to be sure that Abby is being

academically challenged. The parents also shared that Abby is applying to several local

jobs (movie theater)." *Id.* [3]

21.     Amended IEP 8/10/18: In determining that it would be appropriate for SH

to take a course at the APS Career Center while continuing to attend the Kellar School,

the IEP team considered SH's progress in the ESY program, parental and student input,

etc. SH's success while taking the animal science class at the Career Center demonstrated

that this IEP amendment was appropriate and provided SH with FAPE.

22.     In the fall of 2018 SH began to attend one Animal Science class per week

at the Arlington Career Center. This class was taught by Mr. Scott Lockhart who had

been teaching at the Career Center for twenty three years.  The class that SH attended

was titled Technical Animal Science and is a Veterinary Science class. (Tr. 2/21/20-p. 6)

23.     Mr. Lockhart testified that the animal science class that SH attended

included approximately ten students; that his attendance was very good; and that SH "did

very well in the class: was an A student each quarter."  (Tr. 2/21/20 p. 10-11; 15)

24.     SH wanted to leave Kellar and attend the Arlington Career Center full

time. The APS IEP team met on October 31, 2018, to consider whether this was

---

[3] ███████ apparently considered Kellar to be sufficiently academically challenging in August of 2018. However, in April and May of 2019 she and SH rejected Keller and all other IEP team proposed private days schools as not being sufficiently academically challenging.

appropriate The October 31, 2018 Prior Written Notice stated that the reason for action being taken was:

"The team feels that A. has made sufficient progress both academically and socially and emotionally. They would like to see A. returning to an APS school with provided emotional supports and accommodations" and

The other factors relevant to their decision were that: "The IEP team met to discuss A's academic and social-emotional progress while concurrently enrolled at Kellar and Arlington Career Center. The team discussed the Academic Academy program in APS and agreed to initiate the referral and application process." (Ex. S. 001-003)

Ms. Russell, SH's therapist at Kellar, agreed that SH was ready to leave the private day school and attend the APS Career Center full time. When asked whether she had concerns about SH possibly relapsing in going back to a less restrictive setting she replied "I did not have any concerns, no. (Tr. 2/16/20 p. 200)

At the time SH left Kellar "She had successfully completed a partial transition with the Animal Science class. She earned an A." Ms. Russell added that "We hadn't had any concerns about her behaviorally or emotionally. So we all thought that she was ready. And we talked about different options. *Id* at p. 194. She believed that the Career Center was "a good fit because it was a smaller environment and they did have supports there." *Id.* at 195

She did, however, have concerns about SH's relationship with a boyfriend. "When she and her boyfriend broke up, it was a bad situation. She was super reliant on this boyfriend and also very hyper-focused on their relationship. And in my conversations

15

with A following, it seemed to me like that relationship was probably way more unhealthy than I think any of us ever identified." (Tr. 2/16/20 p. 201) Ms. Russell also believed that "…the boy was manipulating her and was really inappropriate with her and making her feel really bad about herself." (Tr. 2/16/20 p. 201)

25.     Amended IEP 10/31/18: In determining that it would be appropriate for SH to leave the Kellar School to attend the APS Career Center as a full time student, the IEP team considered SH's excellent progress at the Kellar School as detailed by Ms. Kathryn Russell, SH's therapist at Kellar, parental and student input, etc. (Ex.2/18/20 p. 001-003) I find that the IEP provided SH with FAPE, The IEP was calculated to provide SH an educational program reasonably calculated to enable him to make meaningful progress appropriate in light of his circumstances.

26.     APS convened an IEP meeting on January 24, 2019. The IEP implemented the team's decision that SH would be leaving Kellar School and attending the APS Career Center full time. The team reviewed SH's need for Accommodations and specially Designed Services and increased the services. ███████ and SH attended the meeting and █████████ signed her agreement to the IEP.

27.     SH saw his Psychiatrist, Doctor James M. Harper, with Columbia Associates in Psychiatry on the twenty-eighth day of each month during January, February and March of 2019. Dr. Harper prepared Reports following each session with SH.

In the Report dated 1/28/19 under the paragraph identified as "Chief Complaint" SH reported that he has conflict with father/stepmother; social stressors. When asked

about his anxiety he responded that it is "All right, sometimes it is a little bad, sometimes

not bad... more teenager abnormality. Not mental health abnormality." (Ex. S. 20-001-

002)

The February 28, 2019 Report continued to list RH's major psychosocial

complaint as conflict with his father and stepmother and social stressors. He also reported

that he liked going to the Arlington Career Center. His Father, ███████ attended this

session and stated that SH seems to be doing well, not cycling out of control when she

has these rough patches and that she handles adapting to new things better than in the

past. (Ex. S. 21-001-002)

Conflict with his Father and Step Mother continued to be listed as SH's Chief

Complaint. He also said that his relationship with his Mother was always a "little rough"

and that their relationship was not especially "parental" And that "We don't argue all the

time but we don't spend much time with each other either."

SH reported that he had an A grade in all but one class (at the APS Career Center)

and that despite missing classes due to his being in the in the hospital he was doing well

in school. (Ex. S. 22-001-002)

28.     Katelyn Gurgiolo, APS Special Education Coordinator, asked ███████

in a March 15, 2019 e-mail how SH was doing at the Center. ███████ responded on

March 18, 2019:

"Hi Katelyn: Thanks for checking in. Honestly, I don't know what the answer is.
Abby was doing well, but then she had a breakdown and ended up back in Dominion for
a week. She said the problem is that she wants to be a boy. Ok, so now my child is
███████. Not an issue except that ███████ is still talking about going to an all-girls early
college program. I don't think he is even remotely ready for college, but I get so sick of

arguing and being blamed for his/her problems. Apparently, I'm abusive and the mental health issues are my fault. So...I can't really say how ▌▌▌▌r is doing other than to say that she/he is doing very well academically." (Ex. P-59)

29.    SH was admitted to Dominion Hospital[4] several times in the first quarter of 2019.  Dr. Gary Spivack was his treating physician during the April 1-11, 2019 admission and produced a series of Physician Progress Notes dating April 1-9, 2019. [5](Ex. S-57-011-019)

Dr. Spivack reported that at the 5/2/19 session that he and SH worked on his relationship with his Mother. SH told him that:

"My mother is refusing to visit me for a couple of days-she says that when she is around me she feels helpless-and so she does not visit me. I was crying when my mom told me this-and tried to get my uncle to me and invited my father-even thought I hate him. "(Ex. S-57-013)

On 5/4/19 SH told his doctor that" I think that I need to live somewhere other than my house. I am thinking about living with my Uncle-or go to college next year-to get out of the house." (Ex/ S. 57-011 & 014)

In the 5/7/19 Report Dr. Spivack noted that he had "Worked in therapy on issues of how he will handle the police interview. He is understandably very anxious about it. S is going by medical transport to the police interview today. (Ex/ S. 57-015)

Dr. Spivack noted in his 5/8/19 Report that "I met with parents along with social worker in family therapy session to discuss progress to date and further treatment plans.

---

[4] Dominion Hospital is a Psychiatric Hospital

They say that the police interview-S was pretty upset about the outcome-saying it was a "he-said and she-said situation." SH said that "I did not think that friends could not meet during the week-I never did while I was a child." And that "Mom yells a lot and is unpredictable." (Ex/ S. 57-016)

On 5/9/19 Dr. Spivack reported that SH was crying and upset because he felt that a staff member had snapped at him. SH said that "Authority being mad at me is one of my biggest triggers-even when I know it is not my fault-and it is very hard at home because my mom is constantly upset with me for something. When she is upset with me-I hate myself." (Ex/ S. 57-017)

In his March 11, 2019 Psychiatric Discharge Summary Doctor Spivack relates under the History of Present Illness that:

"S said that she had a lot of self-injurious behavior and does not care if he died. The patient reported "my self –injurious ideation comes and goes". And "When I came out to my mom, I told her that I hated myself so much and my boyfriend has confronted me and I told her I did not want to be a girl. I wanted to be a boy. I felt that I am a boy for the past year and this has been on my mind this last week." (Ex/ S. 57-001)

30.     All parties agree that SH continued to do well academically. Review of the medical reports, therapist communications, evaluations and pertinent documents establishes that it was SH's conflicts with his family and boyfriend(s), sexual abuse trauma, gender dysphoria, as well as concomitant psychological problems that were the root cause of his hospitalizations: not educational difficulties.

19

31. In response to SH's hospitalizations APS conducted a review on March 25, 2019, of SH's IEP. SH's ability to continue to attend the Arlington Career Center was of concern. The team met. SH and both of his parents participated in the IEP meeting and both parents signed their agreement with the IEP.

The team met to review the current supports and services in place following the student's return from his hospitalizations. SH's medical information was reviewed and additions were made to the amount of dosage in the IEP and two additional goals were added.

The IEP team explained in the March 25, 2019 Prior Written Notice under "Actions Proposed or Refused by the District" what they had considered and what was proposed based on their review of medical and other information available. It was noted that there were concerns about the school's ability to meet the student's mental health needs during the school day and that in order to support his needs there needed to be a greater focus on mental health supports. SH agreed to participate in IOP or another similar level of intensive support program. SH noted that he may have rushed to return to the school after his hospitalization. (Ex. S.23-001-002)

SH's safety plan was reviewed and a system where SH would use different colored post-it notes to non-verbally communicate his needs to teachers and school personnel was proposed.

The IEP included appropriate Summaries of Present Levels of Academic Achievement and Functional Performance, Annual Goals and Accommodations as well as Specially Designed Services and Related Services were also appropriate. The team

also determined that the benefit that SH received from his school year would not be significantly jeopardized if he was not provided ESY and reviewed Transition.

Included in the Summary of Current Assessments was: "A. within the last two weeks (3/9/18 to present) has decided to change her name and gender to male and name to S. A. did not officially change her name to S. through the courts but made it clear to her mother and the school that she wanted to be referred to as SH." (Ex. S.22-001-015)

32.    Review of the March 25, 2019 IEP established that APS provided SH with FAPE, The IEP was calculated to provide SH an educational program reasonably calculated to enable him to make meaningful progress appropriate in light of his circumstances. SH wanted to stay at the APS Career Center and was given the opportunity to continue there and succeed with additional mental health supports.

33.    On April 9, 2019 ███████ sent out an e-mail to Esther Lee, Naghmeh Merck (social worker) (APS employees), India Walsh, therapist, and ███████. In it she wrote:

> "███████ has often gone to the school nurse saying he's sick and I have to leave work to come pick him up. The he's miraculously feeling better at the end of the school day and wants to spend time with his boyfriend. When I say "no" to that the tears flow, I'm scared of you mom", l want to hurt myself and only my boyfriend makes me feel better." Etc.
>
> "Is there a way we could get some criteria for the school nurse wherein ███████ would be told to go back in class if he doesn't have a fever and appears to be fine? Is there some way that I can put some of this on someone else?" (Ex. P-64)

34.    A Progress Note written on April 11, 2018, by Ms. Kelsey Rea, PA-C, a Physician Assistant at Colombia Associates in Psychiatry records that SH's chief presenting complaint is that "He says he is very stressed about his mom recently. He says

his mom is constantly yelling all the time." And that "His relationship with his dad isn't good either." He also reported that things are "Okay" at school and that he feels good about his friendships at school. It was found that his level of Insight and Judgement were good and that his need for Supervision and Precautions was low. (Ex. S. 26, 001-002)

35.     In the April 25th, 2019 Prior Written Notice it was recorded that the IEP team met to review SH's current level of functioning during the school day. SH had missed entire school days of school or gone home early for the past few weeks since the team last met. HP said that the most major stress for him had been his math class. The team reviewed the amount of support that SH would require to remain in class or access instruction. (Ex. S-28-001-002)

Jessica Baker, Assistant Principal at the Arlington Career Center, testified that she was a member of the April 25, 2019, team. She explained that this meeting was held following SH's return from a hospitalization because the committee was trying to review what needed to be in place to allow SH to be successful, (Tr. 2/21/20 p.188)

Alternative placements were discussed and the team reviewed the least restrictive environment options. SH returning to the Kellar School was discussed but SH and his mother strongly rejected Kellar or any other private day school.

Ms. Baker testified that at the April IEP meeting it was proposed that SH return to a private day setting and that "… when the topic of private day school was raised at the meeting, there was—whether it was Kellar or any other, there was a vehement dismissal and refusal to consider a private day school site." (Tr. 2/21/20 p.190) and that:

"The discussion at the meeting was centered around the fact that█████ and SH were concerned with the level of academics that were offered at, specifically, Kellar, or any private day school and they wanted to be able to insure that SH was able to continue accessing highly rigorous coursework." (Tr. 2/21/20 p.191-192)

In an effort to try to work collaboratively as a team with█████ and SH the committee then discussed the APS Interlude Program. When this placement was discussed█████ asked if SH would still be eligible to enroll in a APS Forensic Science course. She was advised that he could. The team then recommended that the least restrictive placement for SH would be in the Interlude Program. The Interlude Program includes increased therapeutic supports and more accessible access to counselors than are available at the Arlington Career Center.█████ signed her agreement to the IEP.

36.    █████ met with Sahni Jasneen, the Assistant Principal at Wakefield High School, regarding the Interlude Program. In response to a May 13, 2019 e-mail from Ms. Jasneen about the meeting and need for an additional IEP meeting,█████ responded:" For now I think████r will be in php (Partial Hospitalization Program) for a while. I have no idea what the time frame is: "I'd like to find a residential treatment center for him rather than having him go back to school at this point, but I am not sure that it is feasible. I will let you know asap." (Tr. P. 67. )

37.    █████ exchanged e-mail with Esther Lee, MSW who was the CARS representative in the May 23, 2019 IEP meeting on May 13, 2019.  Ms. Lee wrote "Remember when I told you that I would look into residentials as much as I could for you? Unfortunately, this is all I got...Not that there isn't more but this was all I could get

23

and it's also in Va...as I know you were looking outside of Va.:/ Newport Academy in McLean, Va. (Ex. P. 68.)

**38.**    The IEP team met again on May 23, 2019. An Amended IEP was drafted on that date and signed by ▮▮▮▮▮▮. (Ex. S-28-00-016)

Ms. Baker, APS Career Center Assistant Principal, testified that because private day schools had previously been rejected by ▮▮▮▮▮▮ and SH the next option was the Interlude Program at Wakefield High School which was SH's home school. This would provide "the next possible level of support to move forward with." (Tr. 2/21/20 p.197)

Although the IEP stated that SH would begin the Interlude Program on May 24th, 2019 it was recognized that SH might not be ready for that. So, as an additional option Homebound services were also proposed for SH until the end of the school year. (Tr. 2/21/20 p.202)

In the 5/23/19, Prior Written Notice section, "Description of each evaluation procedure, assessment, record, or report used as the basis for this proposed or refused action" it was noted that the IEP team relied upon "Parent input and medical updates."

In the section "Description of the factors relevant to the action proposed or refused", it was reported that:

I. "The team met to review updates from ▮▮▮▮▮▮ related to A (SH's) hospitalization and pending release from the Partial Hospitalization Program (PHP) that SH is currently attending. ▮▮▮▮▮▮ shared that she and S are exploring a residential treatment center in Utah, based on a recommendation from an educational consultant."

III. The team reviewed the proposal for Interlude as the Least Restrictive Environment for S. The team also considered a placement in Homebound. The team agreed that "the placement in Homebound would be the most beneficial for S for the interim time between release from PHP and parent enrollment at the residential placement center."

IV. The team agreed to "update the service hours on the IEP to document that Counseling as a Related Service (CARS) will not be provided during the time SH is participating in Homebound services. The team agreed to continue CARS hours for the start of the school year in September."

V. "The team will reconvene upon S's release from the parent placement at the residential treatment center and return to APS. At that time the IEP team will discuss the placement and the previously proposed placement options." (Ex. S-30-002)

39. Ms. Jessica Baker, the VPS Career Center Vice-Principal, testified that she was aware that ███████ had mentioned a possible residential placement for SH at the meeting but that it was understood that the placement would be for mental health purposes and that ███████ "Communicated purpose of that location was primarily for mental health needs, not educational needs." (Tr. 2/21/20- pp. 232-233)

40.    The APS May 23, 2019 IEP Amendment provided SH with FAPE.

Review of IEP and Prior Notice established that APS proposed amendments provided SH with FAPE, The IEP was calculated to provide SH an educational program reasonably calculated to enable him to make meaningful progress appropriate in light of his circumstances. SH's circumstances were that he needed more special education

supports than were available at the Career Center. Proposals that he return to Keller,

where he had done so well or other proposed private day schools were rejected by Ms.

███████ and SH as not being sufficiently educationally rigorous. The alternative proposed

and accepted by ███████ was for Homebound services through the end of the school

year and summer and beginning the 2019-2020 school year the Interlude Program at

Wakefield high school which could offer SH more special education and counseling

services than were available at the Career Center. (Ex. P- 70)

41.    On May 30, 2019, ███████ signed an Enrollment Agreement for SH to

attend Youth Care, a residential facility in Utah. Her placement was made unilaterally

without any required prior notice to APS.

42.    ███████ was asked by her Attorney:

Q: "Was there a reason why you believed that residential as opposed to a day
program was going to be appropriate for ███████ at that point?

A:    "Oh, yeah, absolutely, because if he was in a day program, I would not be
allowed to sleep. I would have to be with him all day. In fact, when he was at home, I
took his door off the hinges." (Tr. 2/18/20 p.79)

43.    ███████ failed to provide appropriate notice to APS of her intention to

remove SH from APS and enroll her in Youth Care and have the school pay the cost. Nor

did she send APS a letter within 10 business days prior to the removal of SH from the

public school notifying the school district that she intended to place SH in a private

residential center and that she wanted APS to pay for the placement.

The May 23, 2019 IEP meeting was the most recent IEP meeting that ███████

attended prior to her removal of SH from the public school, ███████ did not inform the

IEP Team during the meeting that she was rejecting the placement proposed by APS to

provide a free appropriate public education to SH, nor did she express or state any concerns.

While she mentioned her considering a residential placement in passing to several counselors and at the IEP meeting she did not state her intent to enroll SH in any specific residential placement or ask that a residential placement be made at public expense. Instead, ███████ signed her agreement to the IEP.

44.  Ms. Heather Rothenbuescher, the APS Supervisor of Special Education sent Mr. and Ms█████ letter on June 7, 2019. In the letter she wrote:

"I received the notification of June 3, 2019 stating that ███████r would be transferring to a residential treatment center (located in Utah) within the week.

By way of this letter I am notifying you that█████ continues to be eligible for special education services. APS will continue to offer these services to your son based on his unique needs. The Individualized education program (IEP) team is available to meet and review █████ special education needs and services at any time." She went on to explain that: "In the interim, please note that APS will not be held responsible for any unilateral placement that occurs outside the IEP process." (Ex. S-32-001)

45.  On August 12, 2019, Mr. Harold Berkowitz, Esq., sent a letter to APS advising that he was representing █████ and requesting that APS convene an IEP meeting promptly to discuss SH's placement. He stated that the March 25, 2019 IEP failed to consider other placement options and that "The student, however, requires private residential placement in order to receive a free appropriate public education ("FAPE). (Ex. P-72)

46.     APS conducted an IEP meeting on August 28, 2019 in response to the Parent's request that the team consider a residential treatment center as placement for SH. Emily Hanes (therapist) and Josh Vineyard (Principal of Pine Wood Academy), Youth Care employees, participated by phone. The Youth Care team described their program and stated that educational and therapy services are available at the center. The described how SH was doing (SH demonstrated 90% on task behavior in a four week period); that SH is under 24 hour supervision and, that he has weekly sessions with a psychiatrist, therapy, and group sessions, etc.

It was mentioned that the Career Center social worker had referred the ▮▮▮▮ to FAPT (for funding). The Parents responded that they had contacted FAPT but that FAPT had told them that they would only support two residential placement options. The Parents rejected the options offered and ceased communicating with FAPT. (Ex. S-45-001-002)

The morning of the meeting Parent's counsel provided the team with a forty-nine page Psychological Evaluation, dated August 23, 2019, prepared by Dr. Megan McCormick, Ph.D., for Youth Care. (Ex. P. 73).

The team noted that they would be considering the Parent's request to support the current placement at Youth Care. The Supervisor of Special Education stated that the school team would need time to complete some additional review, including fully reviewing the psychological report and speaking with the current residential treatment center to determine additional information about Youth Care. The IEP team, Parents, and Parent's Counsel agreed to meet again on September 10, 2019. (Ex. S-45-001)

47.     The IEP team, including ███████ and her Attorney, Mr. Berkowitz and the Youth Care team, Ms. Thomas and Mr. Vineyard, met on September10, 2019. A review of Dr. McCormick's Evaluation had revealed that SH had "Occurrences of homicidal ideation - which was new information from prior evaluations." And that "Prior to this report, the school team have not seen or heard expressions of homicidal ideation." In her Psychological Evaluation Dr. McCormick, the parent's expert, also discussed that SH had been the victim of sexual assault and that she was suffering from posttraumatic stress as a result.

"███████ has disclosed details over the past year that his boyfriend he met in an Asperger's social skills group during eighth grade sexually assaulted him and would coerce him into being sexual with him. ███████ reported that "I didn't say anything until after he dumped me and then I told my mom what he did. ███████ and his mother have reported the sexual abuse to the authorities."(Ex. P-73 p. 1424-1428).  None of this very relevant important information was communicated by ███████ to the prior IEP teams in in 2018 or 2019. In fact, it appears to have been intentionally withheld[6].

Dr. McCormick's evaluation, especially her disclosure of SH's homicidal ideations and  sexual abuse, had caused the team to appropriately propose many additional supports and goals for SH. ███████ and her attorney were involved in the discussions and many of their suggestions were incorporated into the IEP.

---

[6] *See*: e-mail exchange between Ms. Russell and ███████
(Ex. P. 47) and Dr. Spivack's notes (Ex. S-57, 015-016)

The Parent and her Attorney as well as the Youth Care team proposed that ███████ least restrictive environment should be a private residential school. This was not agreed upon by the school based on team members, due to data of success related to no hospitalizations or risk of assessments completed for the duration of the time enrolled in the private day setting. The team felt that ██████ could be successful in a private day setting.

The IEP team, including ████████ and Mr. Berkowitz, reviewed SH's academic functioning and present levels of performance statement. The team proposed adding and updating the socio-functioning and adding the list of diagnosis from p. 16 of Dr. McCormick's Psychological Evaluation. The team proposed increasing many of the goals in the IEP. For example, the team proposed adding a goal related to suicide and homicidal ideation, social emotional functioning, updating current counseling goals, setting short-term objectives, adding executive functioning goals. The team reviewed current service hours and proposed additional support for executive functioning in the area or organization. The team proposed twenty five hours additional support per week in the special education setting per week. The team proposed 2 hours per week for counseling as a related service. It was also agreed that APS would provide ESY for the summer of 2020. The concerns raised by ████████' Attorney were addressed and many of his suggestions were added; for the most part the team added the goals and services he requested.

The team considered the Least Restrictive Environment options. First considered was the public day school which the team agreed was not appropriate. Private day school was considered next. The school team discussed that the previous private day school

placement had been successful in regards to SH not needing a risk assessment or any

hospitalizations. A "Mr. Berkowitz expressed concern that SH requires continuous

support available from a residential setting and particular the supports that are available

at Youth Care."

\"The team considered a private residential school. The family and private

Attorney expressed that this would be the least restrictive environment. School team

members did not agree that this level of restriction was necessary to access the

educational environment,"

48.     Jessica Baker, Career Center Assistant Principal, was a member of the

September 10, 2019 IEP team. She testified that the Youth Care team, Ms. Thomas and

Mr. Vineyard, who participated telephonically at the IEP meeting, both opined that SH

needed to continue residential placement at Youth Care.

She testified that the IEP team considered what they had to say in making their

deliberations. But that the team did not agree with their recommendations.

Q. "Ultimately, the school system members of the IEP team, did they agree or
disagree with that position?"

A. "The school team did not agree that ▮▮▮▮▮ required residential treatment to
access education."

Ms. Baker testified that despite her disagreement she understood the Youth Care

team's position for the need for a residential placement and that she absolutely

considered their position. (Tr. 2/21/20 p. 222, 226), and:

49.     The school team "reviewed the discussions that were held in the Spring of

2019 which included private day school settings and Interlude within the comprehensive

31

school setting. At that time SH and ▮▮▮▮▮▮ expressed concern with the level of

academic rigor available through a private day school and that was why the team

proposed considering a placement in the Interlude program." ▮▮▮▮▮s stated that with

a private day school setting there is a lack of support once SH leaves the setting in the

evenings.

The school team also reviewed that there was a degree of success when SH was

attending a private day school setting as recognized through a lack of risk assessments or

hospitalizations for the longest time period since middle school.

The IEP team goal was to identify the least restrictive appropriate educational

setting. The team determined that the much more restrictive level of restriction at Youth

Care was not necessary in order for SH to access his education. (Tr. 2/221/20 273-279)

The team proposed a Least Restrictive Environment would be a private day

school setting. Some private day schools considered included Kellar, Frost and Phillips

Fairfax the team clarified that they felt that SH could be successful in a private day

school setting. (Ex. S-48-110-004) The proposed private day schools are small schools

with class size of 3-7 students, all are accredited as special education schools and have

certified special education teachers and related service providers. All have the required

coursework necessary for SH to earn a Virginia high school diploma. (Tr. 2/21/20 p. 270-

271)

50.    Review of the Proposed September 10, 2019 IEP, and the testimony

related to the IEP meeting and the considerations of the team established that all opinions

were considered: specifically that Dr. Megan McCormick's Evaluation and

recommendations therein were considered and in part incorporated. Increased goals and

services were proposed and, most of those proposed by the Parent were include. The IEP

was calculated to provide SH an educational program reasonably calculated to enable him

to make meaningful progress appropriate in light of his circumstances and provide him

with a free and appropriate public education (FAPE).

51.      ██████ signed the Parental Consent for Individual Evaluation The

purpose of the evaluation is because the APS IEP team recommends additional

evaluations to inform the supports and services provided to ████ and consider

eligibility for autism. Also to determine potential eligibility or continued eligibility for

Special Education services: evaluation will be conducted by a multidisciplinary team.

(Ex. S-47-001-002)

52.      ██████ did not sign the IEP on September 10, 2019. APS contacted

her to see if she wanted any changes to the proposed IEP or if she was going to consent.

On October 2, 2019 ██████ informed APS that she did not agree with the IEP and

would not consent. She listed why she was rejecting the IEP. (Ex. P-77)

53.      On November 21, 2019, Mr. Berkowitz sent a letter to Ms.

Rothenbuescher restating ██████ reasons for her rejection of the September IEP. Also

included for the first time was ██████ request that APS make a residential placement

for SH at Youth Care for educational purposes and that APS reimburse her for SH's

placement at Youth Care. (Ex. P. p. 78-2)

54.      Ms. Jessica Kingsley, APS School Counselor and APS expert, testified

that after the September 10th, 2019, the IEP meeting the team agreed to do a

psychological evaluation to look more specifically at autism. She conducted her evaluation on November 4-5, 2019 at the Youth Care residential center in Utah. Following that she wrote a report that was presented at the December 3, 2019 eligibility meeting and participated in that meeting. " (Ex. P. 79) (Tr. 2/20/20 p. 18)

She testified that the decision of the eligibility team was that SH met the criteria for both emotional disability and autism spectrum disorder. (Tr. 2/20/20 p. 50)

She found that SH's emotional disability characteristics and symptoms were very strong, and that they were the primary presenting problem. She discussed the difficulty of determining root cause versus presenting problems. "I think that the symptoms related to the emotional disabilities, in my opinion, were primary. But because some of the criteria were here, we ended up having to go with autism as the primary."(Tr. 2/20/20 p. 54)

When asked what effect, if any, does that have on the actual educational services that a student receives, if it makes any difference? She stated: "No, Frankly, The eligibility is the one thing but the IEP is really what drives the services and the placement and the accommodations and everything within the IEP." (Tr. 2/20/20 p. 54)

55.    APS conducted another IEP meeting on December 10, 2019. The Parents, Mr. Berkowitz and Ms. Emily Thomas from Youth Care attended along with the APS members of the team. (Ex. P. 81)

The team reviewed SH's academic situation and what courses and SOL's were needed for him to graduate as well as his needs, goals, and accommodations. Parents stated that they believed that SH requires full time placement at Youth Care. Ms. Thomas participated fully in the teams discussions. Ultimately, the team discussed the least

restrictive (LRE) and determined that SH needed more support than is available in the public day school and again recommended a private day school placement as the least restrictive alternative.

In an attempt to work with the Parents and achieve an agreed upon IEP, APS team proposed that the private day placement site for SH to receive services could be at Youth Care with APS funding the educational portion of the Youth Care program as a day school, providing certain pre-requisites were met, such as permissions of the Parent; itemization of services by Youth Care; a contract with Youth Care including an agreed upon rate for day placement (Tr.2/21/19 284-87)

APS never received any of the requested information so the proposed IEP could not be finalized at that time; ▇▇▇▇▇ filed this Due Process Request on December 31, 2019.

56.     I reject ▇▇▇▇▇' claims that her consent to the APS 2018 and 2019 IEPS were not "informed consents." ▇▇▇▇▇, ▇▇▇▇▇ as well as SH had the opportunity to fully participate in the IEP meetings; the private neuropsychological evaluation provided to the Committee was considered and utilized in drafting the IEP and, her concerns were noted and acted upon. ▇▇▇▇▇ is an educated and forceful person who would not be easily ignored.

▇▇▇▇▇ signed the Parent Statements agreeing to the IEPs. This statement informed the Parent that if the Parent needs assistance in understanding the information in the IEP she could contact the Office of Special Education at the given phone number.

████████ never contacted anyone regarding any questions or concerns about the April 23, 2018 IEP or any other IEP.

Further, ████████ did not testify to any failure on the part of the IEP Team to include her in the IEP considerations or any effort to exclude her or ignore her concerns. Nor did she identify which sections or provisions of the IEPs she did not agree with at that time or when she discovered that she had disagreements with the IEP. Her main comment was that she relied upon and trusted the guidance and advice of the APS school employees. (Tr. 2/19/20 -pp.46-48)

57.   The Parent has failed to sustain her burden of proving that SH's educational, medical and behavioral and emotional issues are so intertwined that he would not be "available for learning" unless placed in a residential school. She has not proven that SH would be unable to make meaningful educational progress as a student in the private day school placements proposed in the APS IEPs.

58.   Ms. Emily Thomas is the Associate Clinical Director and primary therapist at Youth Care. She was qualified as an expert witness in the field of marriage and family therapy. (Tr. 2/18/20 p. 242) Ms. Thomas produced a Master Treatment Pan for SH on June 26, 2019 which was entirely directed toward SH's psychiatric problems. She noted under Reason for Admission: "At the most recent admission the doctor said RTC was a good way to go at this point." She testified that when SH arrived at Youth Care he was extremely dysregulated, suicidal; thoughts of self- harming and in tears. (Tr. 2/16/20 p. 248).

Ms. Thomas attended the September 10, 2019 IEP meeting telephonically. She recommended that SH needed to be in a residential program. Instead, the IEP team recommended a private day school placement. She also attended the December 10, 2019 IEP meeting.

During her testimony she was asked if, as of September 2019 "Would it have been appropriate placement for SH to be in a private day school setting in Virginia? She responded "No, for the same reasons. I believe that SH would have very quickly decompensated and very likely would have been able to find a way to either self-harm or commit suicide outside the 24/7 care." *Id.* 260.

When asked if she was aware of what specific therapeutic day schools had been proposed by APS she responded that she did not. She did not know that SH had been in a therapeutic private day school in Virginia from April 2018 through January of 2019 and that he had done very well in the school.

When asked if wasn't important to know, in formulating her opinion, whether SH had progressed in a prior private therapeutic day school, where he had attended almost every day, gotten really good grades, had good work habits and availed himself of the therapeutic portions of the program. She responded "I don't know the details of that, no." Id 288-289). During the December IEP meeting Ms. Thomas continued to recommend that SH needed the support of a private residential placement.

59.   Mr. Josh Vineyard is the Academic Director of the Pine Ridge Academy, the educational component of Youth Care. Mr. Vineyard has a BA degree in Special Education mild to moderate disabilities, and is pursuing a masters in special education

37

administration His teaching license is not currently active. He is not licensed in any

professional discipline related to special education or educational therapy. Mr. Vineyard

was accepted as a witness with reluctance. (Tr. 2/19/20 p. 146-154) He discussed his

responsibilities, how the school operated, and his interactions with SH. Mr. Vineyard

didn't remember attending and APS IEP meetings for SH. When his memory was

refreshed he said that he had participated and that it was his recommendation that

residential placement was appropriate for SH at that time. He added that his current

recommendation remained the same "Considering the level of care that SH is still

requiring, it is still my recommendation that an IPC be the level of placement. (Tr.

2/19/20 172-174)

     **60.**    Dr. Megan McCormick was admitted as an expert school psychologist who

had been retained by Youth Care to perform a psychological evaluation in August of

2019. (Ex. P. 73) Dr. McCormick reviewed records that were provided by Youth Care,

spoke to ███████ on the phone and met with SH for around one and a half to two

hours. She testified at great length regarding students like SH and also made some

specific observations regarding SH. Her opinion was that SH needed to be in a

residential placement center.

**DISCUSSION:**

     **FAPE:**   The IDEA is a federal statute that provides students with

disabilities and the right to a FAPE designed to meet their needs. 20 U.S.C. §

1400(d)(1)(A). Central to the IDEA is the requirement that local school districts

develop, implement, and annually revise an IEP that is calculated to meet the

eligible student's specific educational needs. *Thompson R2-J Sch. Dist. v. Luke P.,*

38

*ex rel. Jeff P.*, 540 F.3d 1143, 1148-49 (10th Cir. 2008); 20 U.S.C. § 1414(d). Thus, the

determination of whether a FAPE has been provided turns in large Part on the

sufficiency of the IEP for each disabled child. *Tyler V., ex rel. Desiree V. v. St. Vrain*

*Valley Sch. Dist. No. RE-1J*, 2011 WL 1045434 (D. Colo. 2011) (unpublished) (*citing*

*A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 675 (4th Cir. 2007)).

In *Rowley*, 458 U.S. 176 (1982) 553 IDELR 656 , the Supreme Court

established the following two-Part test that courts should use to decide the

appropriateness of a student's education:

1. Has the state complied with the procedures set forth in the
   IDEA?
2. Is the IEP, developed through the IDEA's procedures,
   reasonably calculated to enable the child to receive educational
   benefits?

The Supreme Court held that when this two-part test is satisfied, the state

has complied with the obligation imposed by Congress, and the courts can

require no more.

In *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*,RE-1,137 S. Ct. 999

(2017) enlarged upon the 1982 *Rowley* case, holding that an appropriate

education for a student with a disability is one that is "reasonably calculated to

enable a child to make progress appropriate in light of the child's circumstances.

" The Court further stated that an IEP must be "reasonable" but need not be

"ideal" *Id.* There is no doubt but that the APS 2018 and 2019 IEPs as well as the

proposed IEPs in September and December of 2019 met this standard.

School Districts need not cater to a Parent's preference and place the student in what the Parent considers the "better" placement. *Z.W. v. Smith, 47 IDELR 4* (4th Cir. 2006, *unpublished*); *Bradley v. Arkansas Dep't of Educ.*, **106 LRP 21288** , 443 F.3d 965 (8th Cir. 2006); and *A.S. v. New York City Dep't of Educ., 63 IDELR 246* (2d Cir. 2014), *unpublished*).

In *Hartmann v. Loudoun County*, 118 F.3d 996, 1004 (4th Cir. 1997), cert. denied, 552 U.S. 1046 (1998), the 4th Circuit, quoting the *Rowley* decision, stated that federal courts cannot run local schools and must be given "latitude" in creating an IEP.

Parents have the right to participate in decisions about their children's placements. However, the IDEA does not give Parents the right to control or veto placement decisions. *White v. Ascension Parish Sch. Bd.*, 343 F. 3'd 373, (5th Cir. 2003). While ███████ had an absolute right to make her placement preference for a residential placement known to the September 10, 2019 and December 10, 2019 IEP teams their failure to grant her request is not a violation on the part of the IEP team.

The Parent's claim that placement was predetermined is found to be without merit and unsupported by the evidence or testimony. However, it should be noted that the court in *T. P. v. Mamaroneck Union Free Sch. Dist.* 554

F 3'd 247, 51 IDELR 176 (2'd Cir. Held that the school staff can discuss

potential services and placements in advance of the IEP meeting, so long as

the school staff arrive at the meeting with an open mind.

In addition, IDEA requires disabled students to be educated in the "least

restrictive environment," which means, "to the maximum extent appropriate . . . with

children who are not disabled." *See I.E. v. Ramsey Bd. of Educ*, 435 F.3d 384, 389 (3d

Cir. 2006)(quoting 20 U.S.C. § 1412(a)(g)(A)).

According to a well-worn analogy from the 6th U.S. Circuit Court of

Appeals, FAPE does not require a "Cadillac." Rather, it requires a "Chevrolet."

The 6th Circuit observed that: "The Act requires that the Tullahoma schools

provide the educational equivalent of a serviceable Chevrolet to every

handicapped student. Appellant, however, demands that the Tullahoma school

system provide a Cadillac solely for appellant's use. We suspect that the

Chevrolet offered to appellant is in fact a much nicer model than that offered to

the average Tullahoma student. Be that as it may, we hold that the Board is not

required to provide a Cadillac, and that the proposed IEP is reasonably

calculated to provide educational benefits to appellant, and is therefore in

compliance with the requirements of the IDEA." *Doe v. Board of Educ. of*

*Tullahoma City Sch.,* 20 IDELR 617 (6th Cir. 1993), *cert. denied,* 111 LRP 3215 , 511

U.S. 1108 (1994).

The APS 2018-2019 IEPs and the 2019 Proposed IEPs have been
carefully reviewed for their appropriateness on the basis of whether or
not they are reasonably calculated to confer some educational benefit
on SH and it has determined that they would provide FAPE to SH.
The LEA is not required to provide the best education or an ideal
education in order to provide a FAPE to the Child. *Endrew, Id.*

A student receives a free appropriate public education through the IEP
process. *MM v. School District of Greenville County,* 303 F.3d 523 (4th Cir. 2002).
Appropriate IEPs "must contain statements concerning a disabled child's level of
functioning, set forth measurable annual achievement goals, describe the services
to be provided, and establish objective criteria for evaluating the child's
progress." *J.P. ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.,* <u>516 F.3d</u>
<u>254</u>, 257 (4th Cir. 2008); 20 U.S.C. § 1414(d).

The Parent's claims that SH's educational and behavioral issues are so
interwoven that they cannot be separated thus mandating a finding that a
residential placement is required to provide him with meaningful education
and FAPE is found to be unsupported by the record and without merit.
*Kruelle v. New Castle County School District,* <u>552 IDELR 350</u>, 642 F. 2d (3'd Cir.
1981)., concerned a thirteen year old boy who was profoundly retarded and
afflicted with cerebral palsy; who could not walk, dress himself or eat

42

unaided. He was not toilet trained and did not speak. His I.Q. was well below 30 and he had a history of emotional problems which resulted in choking and self-induced vomiting when under stress.

In that case all parties agreed that the child needed a residential placement: the main question at issue was who was going to pay for it. *Kruelle* can be easily distinguished from the present case, first by the relative degrees of disability, and where the evidence and testimony demonstrate that SH was able, despite his emotional disabilities and autism, to receive meaningful educational benefits and FAPE from his attendance at the Keller School and the APS Career Center.

In *Schaffer v. Weast*, 554 F. 3d.470 (4th Cir. 2009) the Court held that the District Court was correct when it "declined to use evidence to Monday-morning quarterback the school system." The Court also noted that :Judicial review would simply not be fair to school districts, whose decisions would be judged in hindsight based on later assessments of a student's needs at a later point in time." *Id.* at 477

**Unilateral Placement at Youth Care and Request for Re-imbursement:**

On May 30, 2019, ██████ signed an Enrollment Agreement for SH to attend Youth Care, a residential facility in Utah. Her placement was made unilaterally without

43

any required prior notice to APS. She is now asking that she be reimbursed for her costs
and that APS be required to pay the cost of Youth Care residential private school for SH.

With regard to whether ▮▮▮▮▮ is entitled to reimbursement for a parentally
selected private school placement, I have first applied the three-part test pursuant to
*Burlington Sch. Committee v. Dep't of Educ. of Massachusetts*, 471 U.S. 359 (1985) and
*Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993). "The first step is to determine
whether the program and placement offered by the school district is appropriate for the
child, and only if that issue is resolved against the School District are the second and
third steps considered, i.e., is the program proposed by the parents appropriate for the
child and, if so, whether there are equitable considerations that counsel against
reimbursement or affect the amount of relief." "A decision against the parents at any step
of the process results in a denial of reimbursement." *(Id.)*

As stated herein, I find by a preponderance of the evidence that the 2018 and 2019
IEPs as well as the  September 10, 2019 Proposed IEP and the unfinished Proposed IEP
of December 2019 were appropriate and calculated to provide SH with FAPE pursuant to
the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA") and
in accordance with *Endrew F. v. Douglas County School District*, 137 S. Ct. 988 (2017).
All 2018-2019 IEPs and the September 10, 2019 Proposed IEP were calculated to
provide SH an educational program reasonably calculated to enable him to make
meaningful progress appropriate in light of his circumstances.

The primary purpose of SH's residential placement was not education, but mental
health treatment. Based upon review of all relevant testimony and exhibits I reject the

44

claims of the Parent and her Attorney that the residential placement was needed for educational purposes. (Ex. S. 48 003; Tr. p. 84)

The Parents have repeatedly sought and obtained significant payment for Youth Care services under their health insurance mental health coverage on the basis that the services were "medically necessary." (Tr. 2/19/20 p.240-241,257)  In their appeal of the insurance company's decision to cease coverage in 2019 the Parent's asserted that the Youth Care services were "medically necessary."(Tr. 2/18/20 p. 279-281; 2/19/20 p. 124,139-41, 249).  In addition, Youth Care is required to certify that the services that it provides to SH are medically necessary. (Tr. 2/18/20 p. 279-281; 2/19/20 p. 140-141). The Parents have been pursuing payment for Youth Care for mental health reasons while at the same time maintaining that APS should provide payment for Youth Care residential placement for educational reasons.

Reimbursement to the Parent is only permitted if SH's placement in the residential facility was necessary primarily to provide appropriate educational services.

Tuition reimbursement is expressly precluded for a unilateral parental placement of a student at a private facility where the district "made FAPE available to the child" in a timely manner prior to the placement. 20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300. 148. *S.H. v. Fairfax County Bd. of Educ.*, 875 F. Supp. 2d. 633,657 (E.D. Va. 2012).

With regard to whether ████████ is entitled to reimbursement I find that the facts are not in dispute, and that as a matter of law, reimbursement is not permitted. Arlington Public Schools is under no obligation to pay for the services SH received at Youth Care when the basis for his admission there was medical/mental health problems. *Mary*

45

*Courtney T. v. School District of Philadelphia*, 575 F.3d 235 (3d Cir. 2009), *Munir v. Pottisville Area School District*, 61 IDELR 152 (3d Cir. 2013)

In *Mary Courtney T., supra,* the Court of Appeals "explained that in deciding whether a school district is responsible for paying the costs of a unilateral residential placement that provides both treatment and education, it is essential to determine whether its primary purpose is providing special education or mental health treatment." APS can only be responsible for the expenses of SH's placement at Youth Care if the placement there was necessary primarily to provide appropriate educational services.

███████ and Ms. Thomas from Youth Care testified that SH needed to attend Youth Care in order to keep him safe, primarily from suicidal ideations, which he continues to experience at Youth Care. Since the inescapable conclusion from the record is that the Youth Care placement was primarily for medical not educational purposes, there is no legal basis for making APS financially responsible for the costs associated with the Youth Care placement.

Finally, The description of SH's progress at Youth Care establishes that while he is doing well educationally, he still suffers from multiple mental health issues, including Major Depressive Disorder, Social Anxiety Disorder, Post-Traumatic Stress Disorder, Gender Dysphoria and high functioning Autism. He does not appear to have inproved while at Youth Care.

There is no evidence that the educational program APS has offered, including the services and curriculum to address SH's emotional support needs will not effectively

46

address those needs and afford SH the opportunity for significant learning. There is no objective basis for determining that Youth Care provided a better alternative for SH aside from the residential component. Accordingly, I find that the record provides no basis for ordering APS to reimburse ▆▆▆▆▆ for her costs or for tuition at the Youth Care residential school.

It is not enough for parents to establish the existence of a condition that meets the criteria for a disabling condition as defined in the statute. Parents are also required to establish that the condition adversely affected Student's educational progress. *Munir v. Pottsville Area Sch. Dist.* 61 IDELR 152 (2012)

Finally, I find that ▆▆▆▆▆ made a unilateral private placement for SH at Youth Care for non-educational reasons and is thus not entitled to have APS fund the placement or reimburse her for her costs incurred.

**WEIGHT GIVEN TO WITNESSES:**

In determining the relative weight to be given to the testimony of the witnesses I find that the testimony of the Arlington Public School's experts which included SH's therapists, school counselors, school psychologist, and other professionals who were actively involved with SH during 2018-2019 and who took part in the drafting of his 2018-2019 IEPs to be the most persuasive. Many of the witnesses had known and worked with SH for years. Witnesses who testified about the IEP meetings and proposed placements had met and worked with SH at the IEP meetings and had the opportunity to observed him and listen to his concerns. They reviewed his academic records, report cards and progress notes as well as the medical information provided by ▆▆▆▆▆ to

reach their IEP recommendations. I also find that deference should be given to the opinions of the APS witnesses.

I do not give a great deal of weight to the Parent's expert's opinions that SH needs to be in a residential placement center because I do not believe that their opinions were fully informed. The parent's experts who testified telephonically, Ms. Emily Thomas, Mr. Josh Vineyard and Dr. Megan McCormick, while accepted as experts in their fields, had no knowledge of SH's years at APS; did not know that SH had successfully attended Kellar private day school; did not know any information regarding the private day schools proposed in the September and December IEP meetings; Additionally Youth Care had never requested SH's educational records from APS, nor did anyone from Youth Care contact SH's teachers at Kellar or the APS Career Center to discuss SH's educational progress. It was also clear that Youth Care never reviewed SH's prior IEPs or had knowledge of the basis for the APS recommendations. The only records and information utilized by Dr. McCormick were those provided to her by Youth Care, which in turn received them from ██████████. It is unknown what was or was not provided to Youth Care by ██████████

Ms. Thomas and Dr. Mc McCormick appear to be very accomplished in their fields and I found Ms. Thomas' and Dr. McCormick's testimony regarding SH's mental health diagnoses and problems to be credible. However, no one disagreed that SH has mental health issues. I did not find their opinions that SH needed to have a residential placement to be persuasive. I gave more weight to APS testimony regarding how well SH did at the Kellar School and his part time at the APS career center.

48

I found Mr. Vineyard's lack of a teacher's license and the absence of advanced special education training to be of concern and this further minimized the weight I gave to his opinions. I was also concerned that he had never obtained or requested SH's educational records from APS or Kellar School.

I found ██████ testimony to be somewhat credible and sincere but note that she was not transparent about SH's sexual abuse and homicidal ideations to the IEP teams or during her testimony and I fail to be persuaded by her testimony when considered against the APS witnesses.

### RULING

██████ did not succeed in meeting her burden of proof in her assignments of violations and errors by APS of SH.'s right to FAPE. The facts set out above as well as a thorough review of the exhibits, including the 2018 and 2019 IEPs and the proposed 2019 IEPs, the supporting documents, and the testimony of APS personnel and other witnesses conclusively demonstrates that SH. was provided with FAPE during the relevant periods.

██████ placement of SH in Youth Care was a Unilateral Placement and accordingly she is not entitled to reimbursement. Nor ██████ has not sustained her burden of proving that SH is entitled to compensatory services.

### PREVAILING PARTY:

Arlington County Public Schools

### RIGHT OF APPEAL

This decision shall be final and binding unless either party appeals in federal district court within 90 calendar days of the date of

this decision, or in a state circuit court within 180 calendar days of the

date of this decision.

ENTERED: April 13, 2020

*Morgan Brooke-Devlin*

Morgan Brooke-Devlin, Esq.
Hearing Officer

## CERTIFICATE

I certify that I have e-mailed copies of the above Decision to the following parties on this 13th day of January, 2020.

Mr. Harold G. Belkowitz, Esq.
Mr. John F. Cafferky, Esq.
Ms. Aneta Nikolic, Esq.
Dr. Colleen J. Koval
Mr. Reginald Frazier, Esq

*Morgan Brooke-Devlin*

Morgan Brooke-Devlin, Esq.
Hearing Officer
121 South Washington Street
Falls Church, Virginia 22046
Telephone: 703-533-9099
Facsimile: 703-533-9880
VSB# 17909
mbdevlin@gmail.com

VIRGINIA:

## IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | |
|---|---|
| A.H., a minor by his<br>Parent and Next Friend, P.H., | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )     Case No.: _____<br>) |
| ARLINGTON SCHOOL BOARD,<br>2110 Washington Boulevard<br>Arlington, VA 22204, | )<br>)<br>)<br>) |
| Serve: | )<br>) |
| Monique O'Grady<br>Chair<br>Arlington School Board,<br>2110 Washington Boulevard<br>Arlington, VA 22204<br>Falls Church, VA 22042 | )<br>)<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

## MOTION TO SEAL ADMINISTRATIVE RECORD AND PROCEED ANONYMOUSLY

COMES NOW the Plaintiff, A.H., a minor by his Parent and Next Friend P.H., by and through undersigned counsel, and moves the Court to allow the parent of the minor child involved in this proceeding to proceed anonymously. Movant also asks the Court to seal the administrative record that will be filed in this case. In support of the motion, movant states as follows:

1.     This case involves the special education of a minor and seeks judicial review of the decision of a Special Education Hearing Officer appointed pursuant to the Individuals with

1

Disabilities Education Act, 20 U.S.C. § 1400, et seq. (the "IDEA"), Virginia Code § 22.1-213, *et seq.*, and the corresponding federal and state implementing regulations.

2.      The facts and circumstances in this case involve personal and confidential information directly relating to the student's education, including student's status as a "child with a disability" under the IDEA.

3.      Although there is a presumption that court records will be open to the public, that right is not absolute.  The Court may restrict access where it is "otherwise provided by law."  Va. Code § 17.1-208(B).  Moreover, Virginia law permits the sealing of court records when there is "an interest so compelling that it cannot be protected reasonably by some measure other than a protective order . . . [and] any such order must be drafted in the manner least restrictive of the public's interest." *Shenandoah Publ'g House, Inc. v. Fanning*, 235 Va. 253, 259, 368 S.E.2d 253, 256 (1988).

4.      The privacy of student information and records is protected by federal and state confidentiality statutes.  Among the laws protecting this information are Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g(b)(1) ("FERPA") and Va. Code § 22.1-287.

5.      The Court is required to receive into evidence the Record of Administrative Proceedings from the administrate hearing below. 20 U.S.C. § 1415(i)(2)(C)(i). These records contain extensive confidential information about the student, including educational disabilities and other personal information, which necessitates sealing the administrative record.

6.      Plaintiff seeks permanent sealing of the administrative record due to the confidential and sensitive nature of the material involved.

7.      Moreover, the parent seeks to proceed anonymously using the initials P.H. in all filings.  Although the name of the student is identified by initials, disclosure of the parent's full

2

name and address likely would result in public disclosure of the student's identity and personal

informational relating to the student.  Such disclosure would undermine the FERPA's privacy

protections, as well as those of other laws protecting the rights of minors.

8. The public disclosure of the information in the administrative record and

disclosure of the parent's full name likely would cause emotional distress and harm to the minor

student given the nature of the situation.

9. Protecting the confidentiality of the information by allowing the parent to proceed

anonymously and sealing the administrative record is in the minor student's best interest.

10. The requested relief cannot reasonably be protected reasonably in another manner

because of the voluminous nature of the administrative record and because disclosure of the

parent's full name would lead to identification of the minor.

11. The relief sought is in the manner least restrictive of the public's interest.

Plaintiff does not seek to seal the case in its entirety.  The motion only seeks to protect disclosure

of personal information in order to ensure the minor's privacy and well-being.

WHEREFORE, Plaintiff, A.H., a minor by his Parent and Next Friend, P.H, asks that the

Court grant this motion, allow parent to proceed anonymously, to seal the administrative record

in this matter, and for all other relief this Court deems fair and just.

A.H., a minor, by his Parent and Next Friend, P.H.

By: _____

Counsel

Harold G. Belkowitz
Virginia State Bar No. 37274
hbelkowitz@belkowitzlaw.com
Belkowitz Law, PLLC
10427 North Street, Suite 200
Fairfax, Virginia  22030
(703) 246-9273
(703) 246-9271 facsimile

4

VIRGINIA:

## IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | |
|---|---|
| A.H., a minor by his<br>Parent and Next Friend, P.H.,<br><br>    **Plaintiff,**<br><br>    v.<br><br>**ARLINGTON SCHOOL BOARD,**<br>2110 Washington Boulevard<br>Arlington, VA 22204,<br><br>    Serve:<br><br>        Monique O'Grady<br>        Chair<br>        Arlington School Board,<br>        2110 Washington Boulevard<br>        Arlington, VA 22204<br>        Falls Church, VA 22042<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING
## MOTION TO SEAL ADMINISTRATIVE RECORD AND PROCEED ANONYMOUSLY

Motion to Seal Administrative Record and Proceed Anonymously having come before this Court, upon consideration of any response thereto, and upon consideration of any oral argument; and

IT APPEARING TO THE COURT that this case involves the educational rights of a minor who is a child with a disability pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*; and

IT FURTHER APPEARING TO THE COURT the facts and circumstances in this case involve personal and confidential information, the privacy of which is protected from disclosure

1

by the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g(b)(1) ("FERPA") and Va. Code § 22.1-287; and

IT FURTHER APPEARING TO THE COURT that disclosure of information in the administrative record or disclosure of the parent's name would undermine the privacy protections applicable to the minor and such disclosure would not be in the minor's best interests; and

IT APPEARING TO THE COURT that the relief sought cannot be provided in another way and this Order is drafted in a manner least restrictive of the public's interest; it is hereby

ORDERED that the Motion is Granted; and it is

FURTHER ORDERED that the parent is permitted to proceed anonymously using the initials P.H. in this proceeding; and it is

FURTHER ORDERED that the Clerk of this Court is directed to file the Administrative Record in this matter under seal.

Entered this _____ day of _____, 2020.

_____
Circuit Court Judge

2

**ACCEPTANCE/WAIVER OF SERVICE OF PROCESS AND**
**WAIVER OF FUTURE SERVICE OF PROCESS**
**AND NOTICE**                                          Case No. ........CL20002689-00.........

COMMONWEALTH OF VIRGINIA    VA. CODE §§ 8.01-327; 20-99.1:1; Rules 3:5, 3:8

.........................................Arlington County..................................................... Circuit Court

...A.H., a minor by his Parent and Next Friend, P.H.......  v.  ...........Arlington School Board............
                    PLAINTIFF                                                    DEFENDANT

I, the undersigned party named below, swear under oath/affirm the following:

1.  I am a party [  ] plaintiff  [X] defendant in the above-styled suit.

2.  I have received a copy of the following documents on this date:

   [X] Complaint

      [X] filed on ......................................July 24, 2020............................................ , attached
                                           DATE

      [  ] pre-filing copy pursuant to Va. Code § 20-99.1:1(A), attached

   [  ] Summons with copy of Complaint filed on ................................................................ , attached
                                                           DATE

   [X] Other – Describe:  ..Motion to Seal Admin. Record and Proceed Anonymously.. filed on ....July 24, 2020....
                                                                                  DATE

   I understand that my receipt of these copies and my signature below constitute

      [  ] the acceptance of service of process of these copies, or

      [X] a waiver of service of process and notice which may be prescribed by law.

3.  I agree to voluntarily and freely waive any future service of process and notice as checked below in this case:

   [  ] a.  the 21-day time period for filing a responsive pleading.

   [X] b.  any further service of process.

   [  ] c.  notice of the appointment of a commissioner in chancery and hearings held by such commissioner in chancery, if a commissioner in chancery is appointed.

   [  ] d.  notice of the taking of depositions.

   [  ] e.  notice of the filing of any reports by a commissioner in chancery of the filing of depositions.

   [  ] f.  notice of testimony to be given orally in open court.

   [  ] g.  notice of entry of any order, judgment or decree, including the final decree of divorce.

   I understand that, by waiving service of process and notice, I am giving up my right to be notified of the events where indicated above.

..8/5/2020..................................      ..........................................................
     DATE                                       [■] DEFENDANT        [  ] PLAINTIFF

**TO DEFENDANT**: Notify the Court in writing of any changes of your address while this case is pending.

State/Commonwealth of ...Virginia........... , [  ] City [✓] County of ...Fairfax.............

Subscribed and sworn to/affirmed before me this ..5th.. day of ...August....... , 20 ..20..

by ....................Aneta Nikolic....................
                              PRINT NAME OF AFFIANT

..8-5-2020................      ..........................................................
     DATE                        [  ] CLERK    [  ] DEPUTY CLERK
                     [  ] NOTARY PUBLIC (My commission expires ..........................)
                   Registration No. ...7594296...

           Terrie Lee Mohrmann
           NOTARY PUBLIC
         Commonwealth of Virginia
           Reg. # 7594296
        Com. Exp. Feb. 28, 2022

FORM CC-1406 MASTER 07/19