IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

A.H., a minor by his Parent and )
Next Friend, P.H., )
             )
          Plaintiff, )
             )   1:20-cv-00981 (LMB/MSN)
    v. )
             )
ARLINGTON SCHOOL BOARD, )
          Defendant.

MEMORANDUM OPINION

Before the Court are cross motions for summary judgment in an action brought under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., in which the

plaintiff, who is the mother of a student identified as S.H.,[1] alleges that the Arlington Public

School System ("APS" or "defendant")[2] failed to provide S.H. with the free appropriate public

education ("FAPE") required by the IDEA, and that, as a result, she should be reimbursed for a

portion of the costs she incurred by placing S.H. in a Utah residential program. Plaintiff also

argues that APS failed to identify S.H. as eligible for special education in 2015. The defendant

responds that it fully complied with the IDEA by providing appropriate individualized education

programs ("IEPs") for S.H. in the least restrictive environment.

---

[1] S.H. is a transgender male who uses he/him/his pronouns and prefers to be called by his gender
appropriate name, S.H. That is the name reflected in the Hearing Officer's Decision, and it will
be used in this Opinion; however, the captions of this civil action and many of the records and
pleadings use S.H.'s original female name, abbreviated as A.H., and refer to S.H. as "she" or
"her."

[2] Because it is the proper defendant in a case against a school system, the defendant in this action
is the Arlington School Board; however, the references throughout the pleadings and
administrative record are to the Arlington Public Schools.

Plaintiff has exhausted the IDEA's required administrative procedures by presenting her disputes to an independent hearing officer. After conducting a five-day administrative hearing in which 13 witnesses testified, 173 exhibits were admitted, and over a 1,500 page administrative record was developed, the Hearing Officer denied plaintiff's claim for reimbursement. Plaintiff timely appealed that decision to this Court, which has heard oral argument on the parties' motions telephonically. For the reasons explained below, defendant's Motion for Judgment on the Administrative Record [Dkt. No. 54] will be granted, plaintiff's Motion for Summary Judgment on the Administrative Record [Dkt. No. 59] will be denied, and judgment will be entered in defendant's favor.

## I. BACKGROUND

### A.  **Factual Background**

S.H. has been diagnosed with Major Depressive Disorder, Social Anxiety Disorder, Autism Spectrum Disorder, Parent-Child Relational Problem, Social Exclusion, and Post Traumatic Stress Disorder. AR 49, 141, 169-001, 170-001, 266-118.[3] For years, S.H. has experienced suicidal thoughts and ideations, and attempted suicide several times. AR 81-002, 82-001, 95-001, 141-001. Treatment for these conditions has entailed repeated hospitalizations and entry into partial-hospitalization programs for mental health issues. AR 141-001. It is uncontested that S.H. was not in any special education programs before 2015, and that S.H. has performed well academically.

After a suicide attempt in middle school in 2015, S.H. was admitted to residential treatment at Grafton Integrated Health Network and spent approximately four months in that treatment program. AR 80. In late 2015, upon return to APS, a committee convened to consider

---

[3] References to the extensive administrative record will be referred to as "AR."

S.H.'s eligibility for special education; however, S.H. was not found eligible because the committee did not see an appreciable adverse impact of S.H.'s mental health issues on S.H.'s educational performance at that time. AR 83. After another suicide attempt in 2017, S.H. was admitted to two residential facilities where he received mental health treatment. AR 91, 97. In February 2018, S.H. re-enrolled into APS and an eligibility team convened on April 2, 2018. AR 7, 98, 100. After reviewing updated information and data, the team found S.H. eligible for special education under the classification of Emotional Disability. AR 7. S.H. had also received a private diagnosis of autism. Plaintiff criticizes defendant for not having also found S.H. eligible for services to address autism; however, the Hearing Officer found that the committee properly considered the autism diagnosis in concluding that "it is [S.H.]'s significant difficulties with emotional functioning that currently impedes her ability to attend school." AR 253-008. At an IEP meeting on April 23, 2018, the team agreed upon an IEP with a Social-Emotional goal related to communicating feelings directly to a teacher, counseling as a related service, and calling for a placement in a full-time private day special education program. AR 9, 11. The Hearing Officer concluded that the April 2018 IEP addressed S.H.'s educational needs and provided him with a FAPE. AR 253-011.

School staff recommended placement at Kellar School in Fairfax, and after having the opportunity to visit the school, the plaintiff and S.H. agreed with that placement. Id. Kellar School is an accredited, therapeutic private day school for students with emotional disabilities, high-functioning autism, and other related disabilities, who can benefit from a regular high school academic curriculum. AR 61-001-02, AR 175-170-71. The school is small, with only about 36 students. AR 175-174, AR 178-274. It has correspondingly small classes, with only about three to seven students. AR 175-180-81. The teachers are certified in special education and

3

experienced in working with students with emotional disabilities. AR 178-272-74. The school

utilizes a level system, in which students progress through four levels of responsibility and

independence. AR 175-195. In addition, because Kellar is therapeutic in nature, regular

counseling to support a student's education is both built into the program and available from

licensed counselors on an as-needed basis. AR 175-171, -181-82, 178-275-78.

In August 2018, the IEP team reconvened to consider S.H.'s partial transition to the

Arlington Career Center ("ACC") during the 10th grade year. AR 13. The team agreed that S.H.

had progressed sufficiently at Kellar to be able to begin reintegration into a public day school

setting for part of the day. Id. Under this new IEP, S.H. would continue to take core classes at

Kellar and would be transported to ACC each afternoon to take Animal Science, a class in which

S.H. was very interested. AR 13, 177-239-40. During the first semester of the 2018-19 school

year, S.H. continued to attend Kellar and did well academically. AR 15, 253-012. "His grades

were mainly in the mid to high 90th percentile and he passed his Virginia Standards of Learning

exams (SOLs) in Biology, Geometry, and World History . . . Importantly, he also appropriately

accessed the counseling and other therapeutic supports offered." AR 253-012 (citations omitted).

The Hearing Officer also observed "that during [S.H.'s] nine months at the Kellar School he had

no suicidal episodes, no hospitalizations and no emotional breakdowns. He also had very good

attendance and appeared to thrive at Kellar."[4] AR 253-013. Based on the records from the Kellar

---

[4] Plaintiff argues that the findings that S.H. had a "high level of success" and "also had very good attendance and appeared to thrive at Keller" were contrary to the evidence. During the summer period he attended 16 out of 22 days with 6 excused absences, and between August 28, 2018 and January 24, 2019 he attended 78 out of 89 days with 11 excused absences. AR 15, 16. Plaintiff relies on testimony from Kate Russell, S.H.'s Kellar School counselor, who testified that:

> I mean, looking back on it, I'm like, that's a lot of absences for a kid that only had three
> in the first quarter, for her to have that many during the second quarter. But I think that
> there was some—if I remember correctly, that was when we saw the demise of that

School, the Hearing Officer found that S.H. "demonstrated that he was able to access his education, make very good progress educationally and remain psychologically stable while a student [at Kellar]." Id. Plaintiff testified during the hearing that S.H. was "faking it" by hiding and downplaying issues because S.H. badly wanted to go back to a full-time APS school. AR 176-052. The Hearing Officer gave this testimony little weight:

> I give little weight to [plaintiff's] testimony that S[.]H[.] was only "faking it" at Kellar in order to get to Arlington Tech. (Tr. 2/18/19-p. 52) Whatever the motivation S[.]H[.] demonstrated that he was able to access his education, make very good progress educationally and remain psychologically stable while a student there.

Id.

Because of S.H.'s continued success both at Kellar and at ACC part-time and S.H.'s great desire to return to an APS school full-time, the IEP team reconvened in January 2019 and agreed that S.H. was academically and emotionally ready to transfer from Kellar to a full schedule of academic courses at ACC, in addition to continuing with the Animal Science class. AR 122, 16-003, 175-195-96, 177-266-67. The 2019 spring semester initially proceeded well, as S.H. attended classes and earned good grades, AR 177-268-69, 178-016-17, -060; however, by March 2019, S.H. began to experience frustration at school, sought out counseling more often, and repeatedly asked to leave the school altogether. AR 177-270. During that month, S.H. was hospitalized twice due to suicidal ideation. AR 177-273-74, 176-068-69. According to the admission note for S.H.'s March 11, 2019 hospitalization, the "Stated reason for visit" was "Anxiety caused by gender issues, Depression caused by genetics and trauma," and S.H.'s recognition of "self-injurious ideation [that] comes and goes." AR 57-008, -001. After S.H. was

---

relationship that I've referred to. And I think there were a couple of times where mom and I would have conversations about her taking a mental health day. And that's something that our kids, we excuse. It's not considered unexcused.

AR 175-224.

discharged from this hospitalization, the IEP team reconvened on March 25, 2019 to add additional supports and counseling goals to his IEP. AR 22, 23, 177-274-79. Plaintiff agreed to the IEP. Id. The Hearing Officer concluded that this IEP provided a FAPE. AR 253-021.

Because S.H. continued having a difficult time after returning to school, AR 177-284-85, 28, the IEP team reconvened on April 25, 2019 to discuss new placement options for S.H. in the least restrictive environment, including a potential return to private day school. S.H. and plaintiff strongly opposed this option because they "were concerned with the level of academics that were offered at, specifically, Kellar, or any private day school and they wanted to be able to insure that [S.H.] was able to continue accessing highly rigorous coursework." AR 178-192 (quotation by ACC Assistant Principal Jessica E. Baker ("Baker"), who was present at the April 26, 2019 meeting and who was the "longest involved" staff member according to plaintiff). Because plaintiff and S.H. would not entertain a private day school, the team suggested the Interlude program, which is available at each of Arlington's three comprehensive high schools. AR 177-287-088. Interlude provides a variety of supports, including designated counselors and therapists, educators with expertise working with special education students, and small, self-contained classes, while allowing a student the opportunity to participate in the general education environment. AR 177-287-088, 178-255-57, 27, 28. The team ultimately suggested placement in an Interlude program, and provided plaintiff with the opportunity either to visit the three potential sites or speak with administrators about the program. AR 28, 177-288-89.[5]

_____

[5] According to Baker, plaintiff agreed with

> [a]nd was in support of [the suggested placement at Interlude]. She was actively continuing to work with staff at each of the high schools. I know she toured physically at Wakefield. I know that she had been in contact – I believe, if my memory is correct, that she had toured one other high school and had spoken by phone to the third high school at [the time of the May 23, 2019 IEP meeting].

In May 2019, S.H. was hospitalized at Dominion Hospital. AR 57-011-19. The IEP team reconvened on May 23, 2019 to continue discussions concerning S.H.'s placement. At that meeting, although plaintiff agreed to S.H.'s placement in an Interlude program, AR 29, 30, 177-291-97, she also shared with the IEP team that she was looking into a residential treatment center in Utah. The team understood plaintiff to mean a short-term placement for mental health treatment. AR 30-001, 177-294-97. The Prior Written Notice prepared by Baker on May 23, 2019 stated:

> I. The team met to review updates from [plaintiff] related to [S.H.]'s hospitalization and pending release from the Partial Hospitalization Program (PHP) [S.H.] is currently attending. [Plaintiff] shared that she and [S.H.] are exploring a residential treatment center in Utah based on a recommendation from an educational consultant.
> III. [sic] The team reviewed the proposal for Interlude as the Least Restrictive Environment for [S.H.]. The team also considered a placement in Homebound. The team agreed that the placement in Homebound will be the most beneficial for [S.H.] for the interim time between release from PHP and parent enrollment at the residential treatment center.
> . . .
> V. The team will reconvene upon [S.H.]'s release from the parent placement at the residential treatment center and return to APS. At that time the IEP team will discuss placement and previously proposed placement options.

AR 30-001. Baker, who attended the May 23, 2019 meeting, testified that

> at that time, [plaintiff] had shared some information about the -- after the partial hospitalization program, attending [Utah] Residential Center. But the remainder of our conversation was surrounding the expectation that [S.H.], to our knowledge and based on our conversations, there was always an expectation that [S.H.] was returning to Arlington Public Schools in September for educational purposes. That's what was shared with us, and that's what was -- the team agreed to continue counseling for September.
> . . .
> Based on the information that we discussed, [plaintiff] was looking at [the Utah Residential Center] for the – [S.H.]'s mental health needs, and that there was -- that was never discussed as a long-term continuing component. Again, based on our conversation and what information was shared with me, there was always an expectation that [S.H.] was returning to school in September in Arlington.

---

AR 177-296.

AR 177-294-96. Baker further testified that her understanding of S.H.'s placement at the Utah

residential center was that it was similar to S.H.'s past stays at residential facilities such as

Grafton Integrated Health Network, North Spring Behavioral Healthcare, and Dominion Hospital

based on "looking for support for the mental health treatment, not in terms of educational

purposes."[6] Id. at 177-296. Plaintiff did not make any suggestion or demand that APS fund the

treatment program as an educational program or notify APS that she was rejecting the proposed

Interlude placement. See id. The Hearing Officer found that the May 23, 2019 IEP provided S.H.

with a FAPE. AR 254-025.

On May 30, 2019, plaintiff signed an enrollment agreement with Youth Care Treatment

Center ("Youth Care"), a private residential treatment program in Utah, for S.H.'s admission

there. AR 164. The Hearing Officer found that this was a unilateral placement made by plaintiff

without the required prior notice to APS that she would be seeking reimbursement for its costs.

AR 253-026. Plaintiff selected Youth Care because a doctor recommended that S.H. should be

admitted to a residential center. AR 176-072. Plaintiff testified that she

> had hired an education specialist. . . . she and I talked a lot about the fact that [S.H.] has
> autism and depression anxiety, sort of a lot of conflicting issues, and that it's a very
> complicated situation. So she said that she wanted him to go to a place that had therapists
> that could really deal with the complicated situations. And in fact, she really wanted
> [S.H.] to go to Emily. She specifically said that this Emily Thomas [a therapist at Youth
> Care] is the best therapist for your child.

---

[6] Heather Rothenbuescher ("Rothenbuescher"), APS Director of Secondary Special Education,
who was also present at the May 23, 2019 meeting, similarly testified that she regarded the Utah
residential center that plaintiff mentioned at the meeting to be similar to S.H.'s previous
treatments at places like North Spring Behavioral Healthcare, and that

> I understood it to be a non-educational placement. To be completely honest with you, I
> thought [S.H.] was going there for the summer. I thought [S.H.] was going to go there for
> the summer, you know, kind of reset and return to -- . . . that [S.H.] would go for the
> summer and come back in the fall at the beginning of the school year.

AR 178-260-61.

AR 176-078. Plaintiff also testified that she had looked at residential placements in Virginia, "but the last two places that [S.H.] went into were absolutely not appropriate," referring to Grafton Integrated Health Network and North Spring Behavioral Healthcare. AR 176-079. Plaintiff believed that Youth Care would be an appropriate facility for S.H. because "the counselors, the therapists know how to integrate the issues that the children have so that they can get through the day and not just—not just rely on the therapists, but also learn how to cope themselves. And they had DBT [dialectical behavior therapy] training, which I thought was important." AR 176-080. Additionally, plaintiff further explained that she believed residential as opposed to a day program was appropriate for S.H. because "if he was in a day program, I would not be allowed to sleep. I would have to be with him all day. And in fact, when he was at home, I took his door off his [sic] hinges." Id. Plaintiff told the Hearing Officer that the issues that troubled S.H. at home in the evenings were connected to the school day: "It was almost a broken record. The 'Nobody likes me. Everybody hates me.' You know, 'The kids at school don't want to be with me.'" Id. She further stated: "I felt residential treatment was appropriate, and the only way she's going to get an education. Because otherwise, her emotions keep her from being able to learn." AR 176-090.

Plaintiff retained counsel who, on August 12, 2019, informed APS that he represented plaintiff and requested an IEP meeting to address plaintiff's view that S.H. required a residential placement to receive a FAPE. AR 140. In response, the IEP team convened on August 28, 2019 to discuss S.H.'s educational needs under the least restrictive environment options. AR 44, 45. Youth Care representatives attended via telephone. Id. For the first time, plaintiff's counsel presented the team with a 21-page psychological evaluation from Dr. Megan McCormick. AR 141. To have time to review this information, the IEP meeting was continued to September 10,

2019 to discuss, among other topics, Dr. McCormick's evaluation, S.H.'s academic functioning and present levels, goals, service hours, accommodations, and the least restrictive environment options. AR 45, 46, 48, 177-297. At that IEP meeting, the team proposed a new IEP which took into consideration the impact of social-emotional functioning; the diagnoses from Dr. McCormick's report; updates to the social-emotional functioning, attention/organization, and counseling goals; and additional service hours. AR 46. To implement this IEP, the APS team members proposed a private day placement. AR 46, 177-299-309. Three local (northern Virginia and Maryland) therapeutic day schools were proposed, including Kellar. AR 48-003, 61, 178-271-81. Plaintiff opposed this proposal, contending that private residential school was necessary for S.H. AR 48-003. The APS members of the IEP team concluded that residential placement, and specifically Youth Care, was not educationally necessary for S.H. to receive educational benefit and was not the least restrictive environment for S.H. AR 46, 48, 177-308-13, 178-095-96, 178-265-68. Plaintiff argued that the September IEP did not appropriately identify S.H.'s needs in the present levels of performance ("PLOP") section and did not include goals appropriate for S.H.'s then-current needs. On October 2, 2019, and again on October 3, 2019, plaintiff notified APS that she rejected the IEP because it did not provide S.H. with a FAPE, AR 145; however, the Hearing Officer concluded that the September 2019 IEP provided S.H. with an educational program reasonably calculated to enable S.H. to make meaningful progress and thereby constituted a FAPE. AR 253-032-33. Throughout this time, S.H. remained in the Youth Care facility.

In November 2019, with plaintiff's consent, APS School Psychologist Jessica Kingsley ("Kingsley") traveled to Youth Care to conduct a psychological evaluation of S.H. AR 177-019-20, 147. She also conducted a classroom observation of S.H., toured the campus, and spoke with

a Youth Care therapist and the Academic Director. AR 177-020-23. Among the purposes of the evaluation was to determine whether S.H. had Autism Spectrum Disorder. As a result of her observations and testing, she concluded that S.H. did exhibit certain characteristics consistent with Autism. AR 177-030-31, 49. In an eligibility meeting convened on December 3, 2019, Kingsley presented her findings, including her observations of an Autism Spectrum Disorder. AR 148-005, 177-043-44. The team considered the eligibility criteria for both Autism and Emotional Disability and determined that as of that time, S.H. was eligible for services under both classifications. AR 148-007-13. Autism was selected as the primary classification because of the structure of the eligibility checklists, which provided that to find a student eligible for an Autism classification, the team must rule out emotional disability as the primary disability. AR 148-021, 177-049-52. APS has emphasized that although S.H.'s eligibility category changed, the IEP, not the eligibility category, determines the services available for a student. AR 177-055-56.

The IEP team convened again on December 10, 2019 to discuss least restrictive environment options for S.H. AR 51, 52. Both of S.H.'s parents and counsel attended, as did S.H.'s therapist Emily Thomas from Youth Care.[7] The APS team members again recommended a private day placement as the least restrictive and appropriate alternative. AR 178-285-86, 178-285. As an additional option, in an attempt to work with plaintiff and allow S.H. to remain at Youth Care, APS offered to explore the possibility of defendant funding the day educational portion of Youth Care costs. AR 52, 178-285-86. To proceed with that possible option, APS needed plaintiff's permission, an itemization of services from Youth Care, and a contract with Youth Care that included agreed rates for day school costs. AR 178-286-87, 52-002. APS

---

[7] Plaintiff emphasizes that Kingsley, "the only APS employee with personal knowledge of [S.H.]'s needs after May 2019," did not participate. [Dkt. No. 60] at 5.

reached out to plaintiff following the meeting but did not receive plaintiff's permission to move forward with a potential day placement at Youth Care. AR 53, 54. APS did not receive the necessary information from Youth Care. Id. Instead, on December 31, 2019, plaintiff filed her Due Process Complaint, triggering the administrative proceedings required by the IDEA. The Hearing Officer concluded that the December 2019 IEP could not be finalized because plaintiff did not communicate a decision as to whether she would agree to the proposed day placement at Youth Care, and APS did not receive the necessary information from Youth Care in order to complete the IEP. AR 253-035.

The program cost of Youth Care, other than room and board, had been submitted to, and paid by, the medical insurance carrier that covered S.H., on the basis that the services were medically necessary under the policy's mental health provisions. AR 176-241-42, 58, 277, 291. That medical insurance covered the costs of Youth Care in full until August 2019. After coverage stopped, S.H.'s parents successfully appealed that decision to the carrier, arguing that Youth Care services were medically necessary. AR 58-001, 176-258. The medical insurance carrier covering S.H. has funded the day portion of the Youth Care program, while plaintiff has paid the costs of room and board. AR 58-007, 165, 176-124-25, -128-29. Plaintiff also sought funding from the Arlington County Child and Family Services Division through the Virginia Children's Services Act ("CSA")—which had previously funded S.H.'s placement at North Spring Behavioral Healthcare in 2017 after a suicide attempt—to pay for Youth Care by representing that S.H.'s placement there was necessary for noneducational reasons. AR 178-030-32, -035-39. Plaintiff argues that she "did not seek such funding. Such effort was initiated and pursued by [S.H.]'s estranged father." [Dkt. No. 66] at 11. Given the representations to the

medical insurance carriers and CSA, the Hearing Officer found that plaintiff had represented that Youth Care's services were medically necessary. AR 253-044-45.

**B. Procedural Background**

On April 13, 2020, the Hearing Officer issued a decision, finding that: (1) plaintiff's claims that S.H. was denied a FAPE any time before December 31, 2017 were time-barred by the IDEA's two-year statute of limitations, AR 253-002-04; (2) APS offered S.H. a FAPE in its 2018-2019 IEPs and 2019 proposed IEPs, which included proposed placement for S.H. at Kellar School, a therapeutic private day program in Fairfax, Virginia, AR 253-041, -044; (3) plaintiff's claim that S.H.'s placement was predetermined was without merit and unsupported by the evidence, AR 253-040; (4) S.H.'s educational needs did not require residential placement, and S.H.'s educational and behavioral issues were not so interwoven that they could not be separated, AR 253-042; (5) plaintiff unilaterally placed S.H. at Youth Care without the prior notice to APS required for reimbursement of costs under the IDEA, AR 253-043; (6) the primary purpose of S.H.'s placement at Youth Care was not for educational reasons, but rather for mental health treatment including protection against self-harm, AR 253-044-46; and (7) S.H. does not appear to have improved while at Youth Care, AR 253-046. As a result of these findings, the Hearing Officer concluded that APS was not required to reimburse plaintiff for the tuition or costs of S.H.'s placement at Youth Care. AR 253.

After the April 13, 2020 decision denying plaintiff's request for reimbursement of Youth Care costs, S.H. continued to attend Youth Care. AR 259-74. At a July 2020 IEP meeting in which APS staff, plaintiff, and plaintiff's counsel participated, APS team members again proposed the Kellar School program. AR 275, 276. Plaintiff did not consent to this IEP or

13

proposed placement. AR 275-021. S.H. remained enrolled at Youth Care and received a high school diploma from Pine Ridge Academy[8] on September 11, 2020. AR 274, 294.

Plaintiff originally filed her complaint in state court; it was removed to this court on August 21, 2020. In this lawsuit, plaintiff seeks reimbursement for her out-of-pocket payments to Youth Care for S.H.'s room and board from June 2019 to September 2020 in the amount of $95,965.14, AR 166, 174, 292; travel-related expenses through January 31, 2020 of $3,616.58, AR 166, 174; and attorneys' fees of $61,005.00 and costs of $331.05 in connection with the Due Process proceeding, AR 293, as well as attorneys' fees and costs recoverable as the prevailing party in this litigation.

## II. DISCUSSION

### A. **Standard of Review**

Although IDEA cases are original civil actions, they are adjudicated based upon the record of the administrative proceedings. Cty. Sch. Bd. of Henrico Cty. v. Z.P., 399 F.3d 298, 309 n.7 (4th Cir. 2005). Accordingly, judicial review "may be conducted on the administrative record even if there are disputed issues of material fact." Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996). The parties have agreed that this civil action should be decided based on the administrative record, as supplemented, and without the need for trial. See Rule 16(B) Scheduling Order [Dkt. No. 8] (approving Joint Discovery Plan [Dkt. No. 7] ¶ 14). Plaintiff, as the party challenging the administrative decision, bears the burden of establishing that it was erroneous. Barnett v. Fairfax Cty. Sch. Bd., 927 F.2d 146, 152 (4th Cir.), cert denied, 502 U.S. 859 (1991). To prevail, plaintiff must show both that the special education program

---

[8] Youth Care's school is named Pine Ridge Academy for privacy reasons so that student transcripts do not identify Youth Care.

offered by APS was not appropriate for S.H. and that the unilaterally selected residential center, Youth Care, was appropriate. Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

A district court reviewing a hearing officer's decision under the IDEA "conducts modified de novo review, giving due weight to the underlying administrative proceedings." O.S. v. Fairfax Cty. Sch. Bd., 804 F.3d 354, 360 (4th Cir. 2015) (internal quotations omitted). "[A]dministrative findings in an IDEA case are entitled to prima facie correctness, and the district court, if it is not going to follow them is required to explain why it does not." A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 325 (4th Cir. 2004) (quoting Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 105 (4th Cir.1991)) (internal quotations omitted). "[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'" Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P., 399 F.3d 298, 305 (4th Cir. 2005) (quoting Doyle, 953 F.2d at 105). "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" Id. (quoting Doyle, 953 F.2d at 104) (emphasis added); see also J.P. v. Cty. Sch. Bd. of Hanover, 516 F.3d 254, 259 (4th Cir. 2008). In reviewing administrative findings, courts must have due regard for the hearing officer's opportunity personally to hear the testimony and assess the weight and credibility of the witnesses. See Doyle, 953 F.2d at 104-05; A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 327-28 (4th Cir. 2004); Z.P., 399 F.3d at 306-07 ("We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under Doyle as explicit findings.").

In Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 998 (2017), the Supreme Court discussed and further explained the fundamental standard of appropriateness under the IDEA, first set out in its decision in Hendrick Hudson Central School

District v. Rowley, 458 U.S. 176 (1982). The Court held that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew, 137 S. Ct. at 999. An IEP typically should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Id. Endrew reaffirms a related principle in Rowley that an IEP must be "reasonable," but does not have to be "ideal." Id. (citing Rowley, 458 U.S. at 206-07). Additionally, the "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parents." A.B., 354 F.3d at 328; see also Endrew, 137 S. Ct. at 1001.

**B. Statute of Limitations**

Plaintiff's Due Process Complaint referenced alleged IDEA violations in 2011, 2015, and 2017. Applying the two-year statute of limitations for IDEA programs, the Hearing Officer found that claims based on events before December 31, 2017 were time-barred.[9] Specifically, the time-barred claims included defendant's failure to identify S.H. as eligible for special education as early as December 2011, and as a result of that failure, S.H. being denied a FAPE during that time frame. AR 245-009-10. Plaintiff argues that although the statute of limitations provision is prospective, the scope of claims that the Hearing Officer may address is retrospective, allowing plaintiff two extra years to discover the action forming the basis of the complaint before the statute of limitations clock begins to run.

---

[9] "The IDEA as well as the Commonwealth of Virginia have a two-year statute of limitations period within which parents can raise concerns and note objections regarding their child's educational process and/or bring complaints regarding the actions taken or not taken by the School system in the delivery of a free and appropriate education to the child (FAPE). [citation omitted]. The two year period runs from the date the party knew or should have known about the alleged violations of the law or regulations." AR 254-003 (citations omitted).

16

Plaintiff has not made any argument that she could not have known about the basis for her complaint at the time each action occurred. Specifically, plaintiff argues that prior evaluations of S.H., including the 2015 finding that S.H. did not require special education at that time, did not adequately address S.H.'s needs; however, plaintiff has not argued that there was any reason why she should not have been aware of her claims when each arose.[10] Accordingly, the Hearing Officer's application of the two-year statute of limitations was proper.

## C. <u>Prior Notice</u>

Under 20 U.S.C. §1412(a)(10)(C)(iii):

> The cost of reimbursement described in clause (ii) may be reduced or denied—
> (I) if—
>> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa).

The Hearing Officer found that plaintiff unilaterally placed S.H. at Youth Care without providing the required prior notice to APS, and as a result plaintiff was not entitled to reimbursement of the Youth Care costs. AR 253-043-45. Defendant argues that although plaintiff mentioned during a May 23, 2019 IEP meeting that she was exploring a residential treatment center in Utah, plaintiff did not reject the placement proposed by APS and did not express an intent to enroll S.H. in a private school. Indeed, the IEP team understood that plaintiff was considering a short-term stay for mental health treatment, not for educational purposes. AR 30-

---

[10] From the record, it appears that plaintiff argued before the Hearing Officer that she thought that she had no choice but to agree to the prior IEPs. This argument is not persuasive. The record shows that plaintiff was fully engaged in the IEP process and there is no evidence in the record that would support plaintiff's claim that she was unaware of her right not to agree with an IEP.

001, 177-294-97. At that meeting, the team continued to discuss potential placements, and determined that it would reconvene upon S.H.'s return from Utah. Id. It was not until plaintiff's attorney sent a letter to APS in November 2019, after S.H. had been attending Youth Care for more than five months, that plaintiff put defendant on notice that she was seeking APS funding for Youth Care. AR 146. Plaintiff argues that the word "may" used in the statute is permissive, not mandatory, and that her notice to APS at the May 23, 2019 IEP meeting provided defendant sufficient notice "to address parental objections to a proposed IEP prior to the removal of a disabled child from public school," which is the goal of the notice requirement. Jefferson County Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B., 702 F.3d 1227, 1241 (10th Cir. 2012). Plaintiff also emphasizes that Heather Rothenbuescher, APS Director of Secondary Special Education, responded in a June 7, 2019 letter to plaintiff's desire for residential placement and explicitly stated that APS would not pay for the residential placement. AR 32. That evidence supports the conclusion that APS had some notice, although likely not legally sufficient notice, of plaintiff's intent to place S.H. in the Utah facility for educational purposes and a potential claim for reimbursement of the costs associated with that placement. The Hearing Officer's finding on the issue of notice is not as well supported as her other findings; however, setting it aside does not undermine her ultimate conclusion.

### D. **Deference**

Plaintiff argues that the Hearing Officer's decision is not entitled to any deference because the findings were not "regularly made." In the Fourth Circuit, administrative findings are regularly made if:

> the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.

18

J.P., 516 F.3d at 260. Here, the record shows that the Hearing Officer allowed both parties to make opening statements, introduce evidence, and present and cross-examine witnesses. See AR 175-179. The Hearing Officer frequently asked her own questions of witnesses to clarify issues and, following the hearing, allowed the parties to submit closing briefs, followed by reply briefs. See AR 244-252. The resulting decision is detailed and makes 60 factual findings, including many findings that are dispositive of the issues in the case. Although plaintiff complains that the Hearing Officer gave little weight to the opinions of her witnesses and greater weight to APS' witnesses, this was fully appropriate. See A.B., 354 F.3d at 328 ("IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parents."). Plaintiff argues that APS staff had not personally seen S.H. since the child was placed in Youth Care. To the contrary, APS psychologist Kingsley observed S.H. at Youth Care in November 2019, and APS personnel listened to Youth Care staff, reviewed and discussed Dr. McCormick's private evaluation of S.H. that plaintiff provided, listened to plaintiff's updates, and reviewed Youth Care's records. In fact, the Hearing Officer found that plaintiff's witnesses, in opining that S.H. required a residential placement to receive a FAPE, "had no knowledge of S[.]H[.]'s years at APS; did not know that S[.]H[.] had successfully attended Kellar private day school; [and] did not know any information regarding the day schools proposed in the September and December IEP meetings." AR 253-047-48.

Plaintiff complains that the Hearing Officer's decision "included numerous scrivener's errors, such as incorrectly identifying Plaintiff's counsel as 'Mr. Berkowitz' throughout the Decision and replicating citation errors from the legal conclusions and analysis she copied from her September 9, 2015 Decision in VDOE Case No. 16-001." [Dkt. No. 60] at 6, n.7. In addressing a similar argument in a different IDEA case, the Fourth Circuit has recognized that:

> It must be remembered that in Virginia, the IDEA hearing officers are lawyers appointed through the Supreme Court of Virginia to serve as judges in IDEA due process hearings. [citation omitted]. The hearing officers operate under tight time constraints—in non-expedited cases, a written opinion must be issued within 45 days after a request for a due process hearing is received. [citation omitted]. . . . [T]his short time-frame means that the written opinions may be issued before a transcript has been prepared. Under these circumstances, hearing officers (who have no state-provided law clerks or clerical support) cannot be expected to craft opinions with the level of detail and analysis we expect from a district judge. By rejecting the hearing officer's opinion in this case for lack of detail, the district court improperly held the hearing officer to a standard not dictated by statute or case law and one which ignored the constraints under which an IDEA hearing officer operates.

J.P., 516 F.3d at 263. Accordingly, that the decision has typos and formatting errors does not reduce the weight given to it.[11] Additionally, the Hearing Officer's citation of pre-Endrew case law in no way means that she misunderstood the requirements for a FAPE or applied them incorrectly. As the Hearing Officer correctly explained, although Endrew clarified the substantive standard for what constitutes an "appropriate" education under the IDEA, it did not repudiate the Supreme Court's decision in Rowley; rather, it reaffirmed that decision. AR 253-039. As defendant correctly observes, both this court and the Fourth Circuit have continued to rely upon pre-Endrew precedents as to numerous issues raised in IDEA cases.[12] Accordingly, the Hearing Officer Decision is entitled to a presumption of correctness.

_____

[11] Plaintiff's briefs are also full of typos. See, e.g., [Dkt. No. 60] at 4 ("The IEP team convened on August 28, 2019 and September 10, 2019. [sic] including [sic] Student's lead therapist at Youth Care and Pine Ridge Academy's Academic Director participated and explained how Student's needs relating to his emotional disability and Autism changed and why residential placement was the LRE."); [Dkt. No. 60] at 13 ("The longest involved was Assistant Principal Jessica Baker, who [sic] the April 2, 2018 eligibility meeting.").

[12] See, e.g., T.B. v. Prince George's Cty. Bd. of Educ., 897 F.3d 566 (4th Cir. 2018) (citing to Hartmann v. Loudoun Cty Bd. of Educ., 118 F.3d 996 (4th Cir. 1997) for the proposition that "[t]he IDEA rightly 'recogni[zes] that federal courts cannot run local schools.'"); M.N. v. Sch. Bd. of City of Virginia Beach, 2018 WL717005 (E.D. Va. 2018) (citing to a case quoting from Hartman, 118 F.3d at 1001 and Rowley, 458 U.S. at 199–200 for the proposition that "the [IDEA] does not require the 'furnishing of every special service necessary to maximize each handicapped child's potential.'").

20

## E. __Appropriateness of Placement and Least Restrictive Environment__

Furthermore, plaintiff has not met her burden of proving that the September 10, 2019 IEP

and proposed placement at Kellar did not meet the required standards of appropriateness and

least restrictive environment. Plaintiff argues that the September IEP did not properly address

S.H.'s needs and did not include appropriate goals. The record reflects that the team, which

included APS staff, plaintiff, and her attorney, spent considerable time discussing S.H.'s needs

and identifying goals, including adding new goals and service hours. AR 46, 48. Goals were

updated in social emotional functioning, counseling, and attention/organization. Id. The goals

reflected input from many team members, including the Youth Care participants. AR 177-306-

08. Additionally, the team reviewed the most recent psychological evaluation by Dr.

McCormick, AR 141, and information from Youth Care staff, as well as other data in S.H.'s file.

AR 46, 48, 178-265. The Hearing Officer properly found that this IEP provided a FAPE.

Plaintiff argues that the incomplete December 10, 2019 IEP, in which APS offered to

look into funding S.H.'s day placement at Youth Care, denied S.H. a FAPE because it did not

include all mandatory information such as appropriate goals, accommodations, and services, and

alternatively that plaintiff should be entitled to reimbursement for private day school tuition at

Youth Care based on the December IEP. It is undisputed that the December 10, 2019 IEP could

not be finished because APS requested additional information, including parental consent and an

itemization of the educational services S.H. was receiving from Youth Care, which it did not

receive.[13] AR 175-155-59. The record shows that ACC Assistant Principal Baker contacted

plaintiff on December 12, 2019 for an update as to whether she wanted to move forward with the

---

[13] Defendant states that it later learned during the administrative hearing that it would not have
been possible to do a day placement for S.H. at Youth Care because Youth Care's rates are set up
for insurance companies, not public school divisions.

potential Youth Care "day placement" so that APS could contact Youth Care about the educational hours being provided at their site. AR 53-001. On January 2, 2020, after plaintiff filed her Due Process Complaint but before Baker received it, Baker informed plaintiff that she was "still waiting on [plaintiff's] input to understand if we should move forward with working with Youth Care to understand the special education hours that are being provided." AR 54-002. Baker also asked if plaintiff wanted to reconvene an IEP meeting to discuss the day placement at Youth Care option any further. Id. Plaintiff responded that her attorney had "replied on [their] behalf this past weekend," referring to the Due Process Complaint that was filed on December 31. AR 54-001. Accordingly, because the December IEP was never finalized, plaintiff's arguments that it was incomplete or alternatively that it should provide a basis for plaintiff to be reimbursed are meritless.

In addition to requiring that disabled students receive a FAPE, the IDEA also requires that any FAPE be in the "least restrictive environment." Rowley, 458 U.S. at 202. The least restrictive environment is not just a "laudable goal, but also a requirement of the Act." DeVries v. Fairfax Cty. Sch. Bd., 882 F.2d 876, 878 (4th Cir. 1989); see also Doyle v. Arlington Cty. Sch. Bd., 806 F. Supp. 1253, 1260 (E.D. Va. 1992), aff'd, 39 F.3d 1176 (4th Cir. 1994) (reversing hearing officer who "misunderstood the mandatory nature of the least restrictive environment provisions"). Applicable regulations provide that local placements are highly preferred, and school systems should turn to private placements only when the student's disability is such that he or she cannot be educated in a public-school setting. 34 C.F.R. §300.550(2). Moreover, a school system must ensure that the student's placement is "as close as possible to the child's

home." 34 C.F.R. § 300.552(b)(3).[14] Both the September 10, 2019 and July 2020 IEPs called for

placement in a private day school, including Kellar School, which is in S.H.'s home community

of northern Virginia. Youth Care was on the other side of the country, far from S.H.'s home, and

was also a significantly more restrictive environment than a private day placement. At Youth

Care, S.H. primarily interacted and attended classes only with other teenagers living in his

residence.[15] AR 175-277, 176-187-91.

---

[14] Courts have held residential placements to be inherently more restrictive than day programs in
the students' own communities. Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 132 (2d
Cir. 1998) (quoting Carlisle Area Sch. Dist. v. Scott, 62 F.3d 520, 534 (3d Cir. 1995)), cert.
denied, 517 U.S. 1135 (1996)); see also Sylvie M. v. Bd. of Educ. of Dripping Springs Ind. Sch.
Dist., 48 F. Supp. 2d 681, 697-98 (W.D. Tex. 1999).

[15] At the time of the hearing, Youth Care had "around 62 students," including five students on a
day treatment program, meaning that those five students went home at night. AR 176-150, 175-
278-79. Youth Care has four houses, including Summit House, where S.H. resided and which
contained "mostly students who are in high school." AR 176-186. School hours were between 9
a.m. and 5 p.m., when the seven certified teachers at the school rotated through each house. AR
176-187-91. Josh Vineyard, the Academic Director at Youth Care, described how the school day
was scheduled:

> So for example, the teachers are actually the ones that are rotating through the houses to
> facilitate the math hour, the science hour, the social studies hour, the English hour, the
> foreign language hour, the P.E. hour, the health hour. And so the way -- if you were to
> observe a classroom at Youth Care, what you would observe is a student -- or the teacher,
> facilitating sort of a real quick introduction to getting the students ready for math, for
> example. And from there, the students have identified individually what they should be
> doing, either in a group level or individually, how they'll be doing it, either through direct
> instruction or reinforced through online platforms. And then the students are then graded
> or assessed during the hour by the certified content teacher.
>
> . . .
>
> . . . I don't know if you've seen Little House on the Prairie, but it's a little bit like that.
> The students are in their house, and within the house they have their living area, they
> have the area where the therapists are, they have the area where the nurse's office is.
> There's a director in each one of the houses, and so there is a dedicated space just for
> school. And it is a school classroom, and the teachers are rotating through the houses
> during their seven different periods throughout the day.
>
> HEARING OFFICER: So does that mean that [S.H.] is limited to his interaction with the
> other students who live in the house every day?

Even though mental health issues can interfere with academic progress, the IDEA does not make public school systems responsible for residential placements that primarily address mental health issues. Shaw v. Weast, 364 F. App'x 47, 53-54 (4th Cir. 2010) (parental placement of student in residential facility "based on their desire to ensure [she] did not hurt herself," was not for educational reasons, and school system was therefore not required under the IDEA to provide funding); O.M. v. Pottsville Area Sch. Dist., 723 F.3d 423, 430, 433 (3d Cir. 2013) (school district not required to fund residential placement for mental health needs when parents "feared for his personal safety" and "any educational benefit that he received was incidental"); Ft. Bend Ind. Sch. Dist. v. Douglas A., 601 F. App'x 250, 253 (5th Cir. 2015) ("For the RedCliff placement, the evidence uniformly supports the conclusion that the parents placed Z.A. for noneducational purposes; indeed, the court found that he was placed at RedCliff because his parents were concerned that he would make another attempt at suicide and because he had a drug problem."); Ashland Sch. Dist. v. Parents of Student H., 587 F.3d 1175, 1184 (9th Cir. 2009) (affirming denial of Youth Care expenses as non-educational where, inter alia, student was placed there due to need to monitor after suicide attempts, and "much of E.H.'s time in Youth Care was dedicated to psychological care, not education"); see also, M.C. v. Starr, 2014 WL 7404576, *17 (D. Md. 2014) ("Although these benefits [of social, behavioral, life skills] may be desirable, they are not all essential for M.C. to make progress in her education nor is a residential program the only place where M.C. can gain these skills."); Bd. of Educ. of Montgomery Cty. v. Brett Y., 155 F.3d 557, *13 (4th Cir. 1998) (Table) (IDEA funding not required where it was "non-educational needs which necessitated a residential placement.").

---

THE WITNESS: That is correct. There are opportunities for [S.H.] to interact with other students based on different levels of activity, but that does take place outside of school. AR 176-187-91.

24

Plaintiff argues that S.H.'s emotional and social needs are intertwined with his educational needs, but multiple courts have held that students' mental health and educational needs may be parsed. Shaw, 364 F. App'x at 53-54 (separating student's mental health and educational needs); O.M., 723 F.3d at 430, 433 (same); Douglas A., 601 F. App'x at 253 (same); Student H., 587 F.3d at 1184 (same); M.C., 2014 WL 7404576, *17 (same). As this record shows, plaintiff was able to progress academically despite suffering from significant mental health issues.[16]

Lastly, defendant argues that plaintiff has sought and obtained substantial payment for Youth Care's services under the "mental health" provisions of the family's medical insurance based on the services being "medically necessary." AR 176-241-42, -258, 277, 291. Accordingly, the Hearing Officer properly concluded that the primary purpose of S.H.'s placement at Youth Care was for mental health treatment, not education. AR 253-044-45. On that basis, APS did not violate the IDEA in declining to pay the Youth Care costs plaintiff seeks.

## III. CONCLUSION

For all these reasons, defendant's Motion for Judgment on the Administrative Record [Dkt. No. 54] will be GRANTED, plaintiff's Motion for Summary Judgment on the

---

[16] For example, while at Kellar, S.H. passed the Virginia Standards of Learning exams in Biology, Geometry, and World History, and earned a 98% in Chemistry, 90% in History, 84% in Algebra II, 96% in independent living skills, and 97% in English. AR 254-012. Additionally, in the nine months at Kellar, S.H. "had no suicidal episodes, no hospitalizations and no emotional breakdowns." AR 254-103. As the Hearing Officer explained:

All parties agree that S[.]H[.] continued to do well academically. Review of the medical reports, therapist communications, evaluations and pertinent documents establishes that it was S[.]H[.]'s conflicts with his family and boyfriend(s), sexual abuse trauma, gender dysphoria, as well as concomitant psychological problems that were the root cause of his hospitalizations: not educational difficulties.

AR 254-019.

Administrative Record [Dkt. No. 59] will be DENIED, and judgment will be entered in

defendant's favor by an Order to be issued with this Memorandum Opinion.

Entered this _6_ day of April, 2021.

Alexandria, Virginia

_____/s/_____

Leonie M. Brinkema
United States District Judge

26